Docket No. 88468–Agenda 3–November 2001.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JAMES HARRIS, Appellant.

Opinion filed December 19, 2002.

CHIEF JUSTICE McMORROW delivered the opinion of the court:

Defendant James Harris petitioned the circuit court of Cook County for post-conviction relief pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122–1 
et seq.
 (West 1996)). The circuit court dismissed defendant’s amended petition without an evidentiary hearing. Defendant appeals directly to this court. 134 Ill. 2d R. 651(a). For the reasons set forth below, we affirm in part, reverse in part, and remand for an evidentiary hearing on certain claims raised by defendant.

BACKGROUND

On direct review, this court recited the details of defendant’s crimes. See 
People v. Harris
, 129 Ill. 2d 123 (1989) (
Harris I
); 
People v. Harris
, 164 Ill. 2d 322 (1994) (
Harris II
). We need not repeat those details here. In 1984, following a jury trial in the circuit court of Cook County, defendant was convicted of the murder of Jesse James, Sr., the owner of a tavern on the South Side of Chicago, and the attempted murder of Theresa Woods, who worked as a waitress at the tavern. Defendant also was convicted of one count of aggravated battery and two counts of attempted robbery in connection with this incident, which occurred on February 10, 1983. Defendant received the death penalty for the murder conviction and sentences of imprisonment for the remaining felonies.

During the pendency of his appeal, the United States Supreme Court decided 
Batson v. Kentucky
, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), and this court remanded for a hearing, in light of 
Batson
, on defendant’s claim of discrimination in the exercise of peremptory challenges. Following this hearing, the circuit court denied relief. On direct appeal in 
Harris I
, this court again remanded, determining that additional proceedings were required for resolution of the 
Batson
 issue. The court also found that during the sentencing hearing, the circuit court had improperly considered evidence of a 1969 “murder” for which defendant was never convicted. We vacated defendant’s death sentence, and conditionally vacated his convictions and nondeath sentences subject to reinstatement. 
Harris I
, 129 Ill. 2d at 189. On remand from 
Harris I
, the circuit court resolved the 
Batson
 issue adversely to defendant and reinstated his convictions. The case was then assigned to a different judge for a new sentencing hearing. Following this hearing, the circuit court again sentenced defendant to death for the murder conviction. On appeal, this court affirmed in 
Harris II
.

On June 27, 1995, defendant filed a 
pro se 
petition for post-conviction relief. Subsequently, through appointed counsel, defendant filed an amended petition and a supplement to the amended petition. The amended post-conviction petition raised eight claims for post-conviction relief. We set forth only those claims that are raised by defendant in this appeal.

First, the amended post-conviction petition alleged that defendant was denied his right to effective assistance of counsel under the sixth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VI, XIV) when, during his initial 
Batson 
hearing, his attorneys failed to establish the race of two venirepersons who were excused by the State. The petition asserted that, because of this allegedly defective performance, defendant’s subsequent 
Batson
 appeal was reviewed as to only 15 excused venirepersons rather than the 17 that the petition alleges were excused by the State.

Second, the amended post-conviction petition alleged that defendant was denied his right to the effective assistance of counsel under the sixth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VI, XIV) with regard to his counsel’s handling of his pretrial motion to suppress evidence. Defendant alleged errors on the part of his trial counsel, post-trial counsel and appellate counsel with regard to this issue. According to the petition, defendant’s trial counsel failed to impeach one of the State’s witnesses during the pretrial hearing on the motion to suppress and failed to ask during trial that the motion to suppress be reopened on the ground that this same witness materially changed his testimony at trial. Defendant alleges that his post-trial counsel failed to point to these alleged deficiencies in trial counsel’s performance as a basis for granting a new trial. Defendant alleges in addition that, “[t]o the extent that this issue arguably could have been raised on appeal, Mr. Harris was also denied the effective assistance of appellate counsel.”

The amended petition also set forth a claim alleging that defendant was denied his right to the effective assistance of counsel under the sixth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VI, XIV) during the eligibility phase of his second capital sentencing hearing. According to the petition, defense counsel failed to call as a witness former Chicago police officer Phyllis Ham Garth, whose testimony defendant claims would have raised a reasonable doubt as to whether he acted with the mental state required to render him death eligible.

In addition, the amended post-conviction petition alleged that defendant was denied due process of law when the State knowingly presented false aggravation evidence at the second capital sentencing hearing and failed to turn over to defense counsel medical reports that would have shown the evidence to have been false. According to the amended petition, John Szumigala, who testified in aggravation at the hearing, exaggerated the extent of the injuries he suffered as the victim of a 1971 robbery for which defendant was convicted.

In a related claim, the amended post-conviction petition alleged that defendant was denied his right to the effective assistance of counsel at his second capital sentencing hearing when his attorneys failed to rebut the testimony of John Szumigala in aggravation. The focus of this claim is that defense counsel failed to investigate and present a readily available defense to the State’s primary evidence in aggravation.

Finally, the amended post-conviction petition alleged that defendant was denied the effective assistance of appellate counsel when his attorney failed to raise a meritorious issue on direct appeal concerning the use of victim impact evidence from a prior unrelated offense. According to the petition, the evidence in question was victim impact testimony given by John Szumigala during defendant’s second capital sentencing hearing.

In support of the allegations in his petition, defendant attached affidavits of the two venire members whose race had not been established at the first 
Batson 
hearing. Edward Shealy, one of these venirepersons, stated in his affidavit that he is African American, and Christine Riley Brown, the other venireperson, stated that she is Latino-American. Also attached were affidavits of investigators Jonathan Lyon, Appolon Beaudouin, Jr., and Edward Torres, as well as a copy of a Cook County circuit court record, all of which indicated that Brown appeared to be African American. Defendant also attached an affidavit of Michael Levitin, one of his attorneys at the 
Batson
 hearing, stating that he had made no strategic decision not to present affidavits or other documentary evidence to establish the race of Shealy or Brown.

Defendant’s amended post-conviction petition was also supported by a separate affidavit of attorney Michael Levitin, who was also defendant’s post-trial counsel. In his affidavit, Levitin stated that he made no strategic decision to exclude from his post-trial motions any issues regarding trial counsel’s ineffectiveness in handling defendant’s pretrial motion to suppress evidence. Also attached was an affidavit of attorney James Chadd, defendant’s counsel in his first appeal to this court. Chadd stated in his affidavit that he made no strategic decision to exclude from his appellate brief the issue of trial counsel’s handling of defendant’s motion to suppress.

In addition, defendant attached to his amended post-conviction petition a copy of a police report signed by former Chicago Police Officer Phyllis Ham (now Garth) recounting her interview with Theresa Woods following the incident on February 10, 1983, in which Jesse James, Sr., was killed. Defendant also attached a separate affidavit of investigator Jonathan Lyon recounting conversations with Officer Garth in which Garth confirmed Woods’ statements to her and the accuracy of Garth’s report.

Defendant’s amended post-conviction petition was also supported by a copy of the medical records from the hospital where John Szumigala was treated after the 1971 robbery. The injuries reflected in these records do not appear to be as severe as those described by Szumigala at the sentencing hearing. Defendant also attached an opinion letter from a physician stating that the medical records do not “bear out the allegations of Mr. Szumigala’s permanent injury,” which the physician stated “would certainly have appeared by the time he was discharged from the hospital.” In addition, defendant attached a copy of Szumigala’s 1971 testimony in the trial on the robbery charge, which differs somewhat from the testimony Szumigala gave at the sentencing hearing in 1992. Also attached was an affidavit of attorney Joseph McElligott, who represented defendant at his second capital sentencing hearing. In his affidavit, McElligott averred that he did not receive Szumigala’s 1971 medical records from the State. McElligott added that if he had received the records, he “would have used them to further impeach Mr. Szumigala’s testimony.”

Finally, defendant’s amended post-conviction petition was supported by an affidavit of Charles Hoffman, who represented defendant on appeal from the second capital sentencing hearing. In his affidavit, which addressed the issue of the admissibility of John Szumigala’s victim impact testimony, Hoffman stated that he made no strategic decision not to raise this issue.

On August 20, 1997, the State filed an amended motion to dismiss defendant’s amended post-conviction petition. Following oral argument, the circuit court granted the State’s motion to dismiss defendant’s amended post-conviction petition without an evidentiary hearing.

The circuit court concluded that the issues raised in the petition were either previously litigated or “do not raise questions of law such that the defendant’s constitutional [rights] have been neglected or sacrificed.” The court rejected defendant’s claim that he was denied the effective assistance of counsel at his 
Batson
 hearing. The court also rejected defendant’s claim that his appellate counsel was ineffective for failing to raise the issue of the improper use of victim impact evidence from a prior unrelated offense.

Defendant moved to reconsider and vacate judgment, and the motion was denied. Because defendant was sentenced to death for the underlying murder conviction, his appeal lies directly to this court. 134 Ill. 2d R. 651(a). We will recount additional relevant facts in the context of the issues on appeal.

ANALYSIS

The Illinois Post-Conviction Hearing Act provides a mechanism by which criminal defendants can assert that their convictions and sentences were the result of a substantial denial of their rights under the United States Constitution, the Illinois Constitution, or both. See 725 ILCS 5/122–1 (West 1996). An action for post-conviction relief is a collateral proceeding and is not an appeal from the underlying judgment. 
People v. Mahaffey
, 194 Ill. 2d 154, 170 (2000); 
People v. Morgan
, 187 Ill. 2d 500, 528 (1999). In order to be entitled to post-conviction relief, a defendant must establish a substantial deprivation of federal or state constitutional rights in the proceedings that produced the judgment being challenged. 
Morgan
, 187 Ill. 2d at 528; 
People v. Tenner
, 175 Ill. 2d 372, 378 (1997).

The purpose of a post-conviction proceeding is to permit inquiry into constitutional issues involved in the original conviction and sentence that were not, and could not have been, adjudicated previously on direct appeal. 
People v. Haynes
, 192 Ill. 2d 437, 464 (2000); 
People v. Towns
, 182 Ill. 2d 491, 502 (1998). Issues that were raised and decided on direct appeal are barred by the doctrine of 
res judicata
. 
Towns
, 182 Ill. 2d at 502; 
People v. Whitehead
, 169 Ill. 2d 355, 371 (1996), 
overruled on other grounds
, 
People v. Coleman
, 183 Ill. 2d 366 (1998). Issues that could have been presented on direct appeal, but were not, are waived. 
Haynes
, 192 Ill. 2d at 465; 
Towns
, 182 Ill. 2d at 503. However, the doctrines of 
res judicata
 and waiver are relaxed in three situations: where fundamental fairness so requires, where the alleged waiver stems from the incompetence of appellate counsel, or where the facts relating to the claim do not appear on the face of the original appellate record. 
Mahaffey
, 194 Ill. 2d at 171; 
Whitehead
, 169 Ill. 2d at 371-72.

A defendant filing a post-conviction petition is not entitled to an evidentiary hearing as a matter of right. 
Mahaffey
, 194 Ill. 2d at 171; 
Whitehead
, 169 Ill. 2d at 370-71. An evidentiary hearing on post-conviction claims is warranted only where the allegations of the post-conviction petition, supported where appropriate by the trial record or accompanying affidavits, make a substantial showing that the defendant’s constitutional rights have been violated. 
Haynes
, 192 Ill. 2d at 465; 
Towns
, 182 Ill. 2d at 503. In determining whether to grant an evidentiary hearing, all well-pleaded facts in the petition and in any accompanying affidavits are taken as true. 
People v. Brisbon
, 164 Ill. 2d 236, 244-45 (1995); 
Towns
, 182 Ill. 2d at 503. A trial court’s determinations regarding the sufficiency of the allegations in a post-conviction petition are reviewed 
de novo
. 
Morgan
, 187 Ill. 2d at 528; 
People v. Coleman
, 183 Ill. 2d 366, 388-89 (1998).

With these principles in mind, we consider whether the circuit court erred in dismissing defendant’s post-conviction petition without an evidentiary hearing. Before this court, defendant raises six claims for review. We address each of them 
seriatim
.

I. 
Batson
 Claim

Defendant argues that his attorneys were ineffective at his first 
Batson 
hearing when they failed to establish the race of Edward Shealy and Christine Riley Brown, two venirepersons who were excused by the State.

At the start of the hearing, which took place in 1987, the parties disputed the total number of African American venirepersons who had been peremptorily challenged by the State. Defense counsel argued that the number was 17, while the State maintained that the total was 15. The two disputed venirepersons were Shealy and Brown. At the behest of the trial court, defense counsel investigated the matter and informed the court that while he had been unable to speak directly to Shealy and Brown, he had spoken by telephone with members of their households, who informed him that Shealy and Brown were African Americans. The State presented no evidence to refute this assertion, and the trial court judge concluded that Shealy and Brown were African Americans. Having found that the State used 17 of its 20 peremptories to excuse African Americans, the judge then determined that defendant had established a 
prima facie 
case of 
Batson 
discrimination. Pursuant to 
Batson
, the State was then required to provide race-neutral reasons for its peremptory challenges. At the conclusion of the hearing, the trial court found that “the challenges were used for neutral reasons[,] not for racial reasons.” On appeal in 
Harris I
, this court determined that Shealy’s and Brown’s race had not been properly established, and that defendant therefore had waived his 
Batson 
claim as to these two venire members. Accordingly, in reviewing defendant’s 
Batson
 claim, we considered only the 15 excused venirepersons that the parties agreed were African Americans. 
Harris I
, 129 Ill. 2d at 172.

Before this court, the State initially argues that defendant’s 
Batson
 claim is barred by the doctrines of waiver and 
res judicata
. Pointing to our decision in 
Harris I
, the State asserts: “this Court has already decided that Petitioner forfeited his right to challenge the exclusion of jurors Riley [Brown] and Shealy when counsel failed to make an adequate record” of their race. The State contends that our recognition of waiver in 
Harris I 
is 
res judicata 
as to defendant’s claim in the case at bar with regard to Shealy and Brown. We disagree.

As noted, the doctrines of 
res judicata 
and waiver are relaxed where the facts relating to the claim do not appear on the face of the original appellate record. Here, as this court noted in 
Harris I
, there was nothing in the record establishing the race of the two venire members in question. 
Harris I
, 129 Ill. 2d at 172. Indeed, it is the absence of facts establishing Shealy’s and Brown’s race that is at the heart of defendant’s claim, which, as noted, is that his counsel was ineffective for failing to establish their race. The facts relating to this claim do not appear on the face of the original appellate record, and 
res judicata 
and waiver therefore do not apply in this instance.

Notwithstanding the foregoing, the State points to this court’s decision in 
People v. Evans
, 186 Ill. 2d 83 (1999), where a similar post-conviction claim was found to have been waived because the defendant failed to include in the record the race of the witnesses who testified at trial. However, the defendant in 
Evans
 did not claim, as does defendant in the instant case, that his counsel was ineffective for failing to establish the witnesses’ race. Instead, his post-conviction claim was simply a variation of the fourteenth amendment 
Batson 
claim that he had raised on direct appeal. Defendant in the instant case raises a different, sixth amendment claim of ineffective assistance of counsel. Therefore, we find 
Evans 
inapposite to the case at bar.

Turning to the merits of defendant’s claim, we recall the familiar standard by which we review ineffective assistance of counsel claims. To succeed on a claim of ineffective assistance of counsel, a defendant must satisfy the two-part test set forth in 
Strickland v. Washington
, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). Under the first prong of this test, the defendant must demonstrate that his counsel’s performance was deficient. In other words, “the defendant must show that counsel’s representation fell below an objective standard of reasonableness.” 
Strickland
, 466 U.S. at 688, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. However, even if it is established that counsel’s performance was professionally unreasonable, this, by itself, is insufficient to warrant reversal. The defendant must also meet the second prong of the 
Strickland 
test: he must demonstrate that counsel’s deficiencies resulted in prejudice. In order to establish prejudice, “[t]he defendant must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” 
Strickland
, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. A defendant must satisfy both prongs of the 
Strickland 
test in order to succeed on a claim of ineffective assistance of counsel. 
Strickland
, 466 U.S. at 697, 80 L. Ed. 2d at 699-700, 104 S. Ct. at 2069; 
Morgan
, 187 Ill. 2d at 530.

In the case at bar, defendant argues that his counsel’s failure to establish the race of venirepersons Shealy and Brown at the 
Batson 
hearing was professionally unreasonable. Defendant also contends that he suffered prejudice as a result of this allegedly deficient performance. According to defendant, there is a reasonable probability that, had these venirepersons’ race been properly established, this court in 
Harris I 
would have found the State’s reasons for excusing Shealy and Brown to be pretextual and would have reversed defendant’s convictions. Alternatively, defendant argues that there is a reasonable probability that this court would have found the trial court judge’s findings as to these two venirepersons erroneous and would have remanded for further 
Batson 
proceedings as to Shealy and Brown.

In 
Batson
, the Supreme Court held that it was unconstitutional for the prosecution to use a peremptory challenge to exclude a prospective juror solely on the basis of race. The Court in 
Batson 
outlined a three-step process for evaluating claims of 
Batson 
discrimination. First, the defendant must make a 
prima facie 
showing that the prosecutor exercised peremptory challenges on the basis of race. Once a 
prima facie 
case is made, the burden shifts to the prosecutor to articulate a race-neutral explanation for excusing the venirepersons in question. 
Hernandez v. New York
, 500 U.S. 352, 358-59, 114 L. Ed. 2d 395, 405, 111 S. Ct. 1859, 1866 (1991); 
People v. Williams
, 164 Ill. 2d 1, 19 (1994). At this stage of the process, the explanation given by the prosecutor need not be persuasive, or even plausible. 
Purkett v. Elem
, 514 U.S. 765, 768, 131 L. Ed. 2d 834, 839, 115 S. Ct. 1769, 1771 (1995). A neutral explanation is one based on a reason other than race. 
Harris II
, 164 Ill. 2d at 333. “Unless a discriminatory intent is inherent in the prosecutor’s explanation, the reason offered will be deemed race neutral.” 
Hernandez
, 500 U.S. at 360, 114 L. Ed. 2d 406, 111 S. Ct. at 1866. Once the prosecutor articulates his reasons for striking the prospective jurors in question, the process moves to the third step: the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. 
Hernandez
, 500 U.S. at 359, 114 L. Ed. 2d at 405, 111 S. Ct. at 1866. Because the trial court’s decision as to discriminatory intent represents a finding of fact, this determination is entitled to great deference and will be disturbed on appeal only if it is clearly erroneous. 
Hernandez
, 500 U.S. at 364-65, 369, 114 L. Ed. 2d at 409, 412, 111 S. Ct. at 1869, 1871; 
People v. Wiley
, 165 Ill. 2d 259, 274 (1995); 
Harris II
, 164 Ill. 2d at 333. Where more than one explanation has been offered for the exclusion of a venire member, it is sufficient for our purposes if at least one of these explanations is race neutral. 
People v. Andrews
, 155 Ill. 2d 286, 294 (1993); 
Wiley
, 165 Ill. 2d at 278.

In the case at bar, defendant’s 
Batson
 argument turns on whether the reasons given by the State for excusing Brown and Shealy were pretextual, and on whether the trial court’s determination that they were race neutral was clearly erroneous. If these questions are answered in the negative, it follows that defendant suffered no prejudice as a result of counsel’s failure to establish Shealy’s and Brown’s race. Accordingly, defendant’s ineffective assistance of counsel claim would fail. 
Strickland
, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069; 
Morgan
, 187 Ill. 2d at 530. For the reasons that follow, we conclude that defendant’s 
Batson 
claim is without merit.

Christine Riley Brown

During 
voir dire
, which was conducted by the trial court judge on April 23 and 24, 1984, Christine Riley (now Brown) stated that she graduated from Richard Vocational High School and had worked for six years as a directory assistance operator for Illinois Bell. With regard to her place of residence, she agreed with the judge when he stated that she lived in “Hyde Park or Kenwood,” which are two neighborhoods in the same vicinity on Chicago’s South Side. Riley had a friend who was a lawyer. She had never spoken to this friend about her philosophies of law or law enforcement. Riley was separated from her husband, who had done auto body work during the time that they were together. Her nephew had been the victim of a crime. He was stabbed “about three months ago” in front of his house on the South Side of Chicago. Riley said “[i]t was a fight,” and she did not know “exactly what happened.”

The 
Batson 
hearing was conducted by the same judge who presided at trial. At this hearing, Daniel Franks, one of the prosecutors in the case, explained his reasons for excusing Brown. One of these reasons was that she “lived in the Hyde Park area.” Franks explained that, based on his experience, it was his belief that people who live in the Hyde Park and University of Chicago area “have a certain attitude about themselves and that community.” According to Franks, “[t]hey are more interested in scholastic endeavors and maybe would be more open to new ideas and other types of ideas than people in the rest of the Chicago area.” Franks stated that in selecting jurors, he looks for people who “are going to listen to the evidence and make their findings of fact based on the evidence that they get in this courtroom, and not guess or attempt to go beyond the rulings of the court or the jury instructions.”

Defendant argues that the reasons given by the prosecutor for excusing Brown “appear either pretextual or unsupported by the record.” With regard to Brown’s place of residence, defendant notes that Brown never stated that she was a resident of Hyde Park. Instead, she simply answered “yes” when the judge stated: “You live in Hyde Park or Kenwood, did you say?” In addition, defendant emphasizes that Brown graduated from a vocational high school and worked as a directory assistance operator. According to defendant, “there is no evidence she possessed the characteristics of Hyde Parkers which Franks found objectionable.”

As defendant correctly notes, Brown did not state that she lived in Hyde Park. Her answer to the judge’s question about her place of residence indicated that she lived either in Hyde Park or Kenwood. However, the prosecutor, in explaining why he excluded Brown, did not say that she lived in Hyde Park. His statement was that she “lived in the Hyde Park 
area
.” (Emphasis added.) This statement could apply to Brown whether she lived in Hyde Park or Kenwood.

Defendant also contends, as noted, that Brown did not necessarily possess the characteristics that the prosecutor found objectionable in “Hyde Parkers.” Defendant raised this identical argument in 
Harris I
 regarding a different venire member. There, defendant challenged the prosecutor’s explanation that a venire member was excluded in part because of her residence in Hyde Park. According to defendant, the State could not rely on such an explanation unless it could show that Hyde Park residents actually did tend to be scholarly, open to new ideas and not likely to base their findings of fact on evidence, 
and 
that the venireperson in question actually possessed these traits. 
Harris I
, 129 Ill. 2d at 176-77. We rejected defendant’s argument. We determined in 
Harris I 
that the State’s failure to show that a group actually possesses the undesirable traits attributed to it by the State, or that an excluded venire member also possesses these traits, is a factor that should be considered by the trial court in evaluating the legitimacy of the State’s explanation. However, the State is not required, at the second stage of the 
Batson
 process, to make such a showing. At the second stage, “it is not necessary that the State establish the empirical truth of the reason it cites in support of a challenge to a juror.” 
Harris II
, 164 Ill. 2d at 338. All that is required of the State at the second stage is that the prosecutor’s explanation be facially race-neutral. 
Hernandez
, 500 U.S. at 360, 114 L. Ed. 2d at 406, 111 S. Ct. at 1866.

We conclude that, in the case at bar, the prosecutor’s explanation that Brown was excluded because she lived in the Hyde Park area is race-neutral. As noted previously, at the conclusion of the 
Batson
 hearing, the trial court judge found that “the challenges were used for neutral reasons[,] not for racial reasons.” With regard to Brown, the judge specifically found that the explanation that she lived in “the community of Hyde Park” was race-neutral. We cannot say that the judge’s determination here was clearly erroneous. 
Hernandez v. New York
, 500 U.S. 352, 364-65, 369, 114 L. Ed. 2d 395, 409, 111 S. Ct. 1859, 1869, 1871 (1991); 
Wiley
, 165 Ill. 2d at 274; 
Harris II
, 164 Ill. 2d at 333. We therefore reject defendant’s 
Batson 
claim as to the exclusion of venire member Christine Riley Brown.

Edward Shealy

During 
voir dire
, Edward Shealy stated that he had a bachelor’s degree in music and worked as a docket manager at a Chicago law firm. Shealy had worked at this firm for 3½ years, and prior to this had been a docket manager at a different firm for six years. Shealy told the judge that he had “plenty” of close friends who were attorneys but did not discuss with them their philosophies about law or law enforcement because “[t]hey don’t have time.” Shealy also indicated that he had a close friend who was a “new recruit” with the Chicago police department. When asked if he ever talked to this friend about his work with the police department, Shealy answered, “None whatsoever.” Shealy also stated that he did not talk to this friend about his police training.

At the 
Batson 
hearing, prosecutor Daniel Franks offered several explanations for excusing Shealy. One of them was that, while Shealy indicated he had “plenty” of close friends who were attorneys, he insisted that he never talked to any of them about their philosophies of law or law enforcement. Franks stated that this response “did not make sense,” and he commented on the demeanor that Shealy displayed while giving it: “I don’t think I can do justice in [
sic
] the way that the juror answered [the judge’s] question in terms of his tone of voice and his mannerisms while answering that question.” According to Franks, Shealy’s answer was “the type of response that did not give me a feeling that I wanted him on that jury.”

Defendant argues that this explanation “appears pretextual.” He points to three white venire members–Theresa Najdowski, Richard Gray, and Michael Dolan–who had friends or family members who were attorneys
(footnote: 1) and who were accepted as jurors, even though they were never asked if they discussed legal matters with the attorney. Defendant notes that the State expressed no concern about this issue with regard to these jurors.

This court has consistently held that where a prosecutor excludes a minority venireperson based on a certain characteristic, but does not reject a white venireperson who shared the same characteristic, “it does not follow that this in itself shows that the prosecutor’s explanations were pretextual.” 
People v. Young
, 128 Ill. 2d 1, 23 (1989); 
Harris I
, 129 Ill. 2d at 179; see 
Wiley
, 165 Ill. 2d at 282. In 
Wiley
, this court explained:

“The State’s purposeful discrimination is not automatically established by the mere coincidence that an excluded juror shared a characteristic with a juror who was not challenged. The excluded juror may possess an additional trait that caused the State to find him unacceptable, while the juror who was not challenged may possess an additional characteristic that prompted the State to find him acceptable to serve as a juror. ([
People v.
]
 Ramey
, 151 Ill. 2d [498,] 520 [(1972)].) ‘[A] peremptory challenge is based on a combination of traits, and a juror possessing an unfavorable trait may be accepted while another juror possessing that same negative trait, but also possessing other negative traits, may be challenged.’ [
People v.
] 
Mitchell
, 152 Ill. 2d [274,] at 295 [(1992)].” 
Wiley
, 165 Ill. 2d at 282-83.

In the case at bar, while Shealy and the three white jurors shared the characteristic that they all had close friends or family members who were attorneys, Shealy possessed “an additional trait that caused the State to find him unacceptable.” 
Wiley
, 165 Ill. 2d at 283. In this instance, the additional trait was that, unlike Najdowski, Gray or Dolan, Shealy had “plenty” of close friends who were attorneys, yet he insisted that he never talked to them about their philosophies of law or law enforcement. In such a situation, the fact that white jurors also had close friends or family members who were attorneys does not render the State’s explanation for excluding Shealy pretextual. 
People v. Young
, 128 Ill. 2d 1, 23 (1989).

As noted, defendant also objects that no one asked the white jurors if they discussed legal matters with their friends or relatives who were attorneys. The 
voir dire
 in this case was conducted by the trial court judge. This court has held that “[t]he State’s failure to pose additional questions does not lead to the conclusion that the reasons given by the State were a mere pretext for racial discrimination.” 
Wiley
, 165 Ill. 2d at 276, citing 
People v. Kitchen
, 159 Ill. 2d 1, 20-21 (1994); 
Harris II
, 164 Ill. 2d at 334.

At the conclusion of the 
Batson
 hearing, the judge found that the State had exercised its peremptory challenges for race-neutral reasons and had rebutted defendant’s 
prima facie
 case. With regard to Shealy, the judge specifically mentioned the explanation that Shealy “works at a law firm” and had “plenty of friends who were lawyers,” and concluded that this was an adequate basis for excluding Shealy. In elaborating upon this explanation, the judge opined that because Shealy worked for a large 
civil
 law firm, Shealy might take the view that criminal law is not very important.

Defendant challenges the judge’s findings on the ground that they do not reflect the reasons actually given by the prosecutor. Defendant argues that Franks’ actual reasons for excusing Shealy were not that he worked at a law firm and had friends who were lawyers, or that Shealy thought criminal law was unimportant. Rather, the prosecutor stated that he doubted Shealy’s candor when Shealy stated that he never talked to his attorney friends about law enforcement issues or philosophies of the law.

This court has repeatedly held that there is no need for a trial court judge to enter findings with respect to each black member of the venire excluded by the prosecution. 
People v. Mack
, 128 Ill. 2d 231, 245-46 (1989); 
People v. Fair
, 159 Ill. 2d 51, 76 (1994); 
Harris II
, 164 Ill. 2d at 335. In both 
Mack 
and 
Fair
, the circuit court judges who conducted the 
Batson
 hearings found at the conclusion of the hearings that the explanations offered by the prosecution were race-neutral and sufficient under 
Batson
. In each case, the judge made only this general finding and did not enter specific factual findings for each black venireperson excluded by the State. We held in both 
Fair
 and 
Mack
 that such a general finding was specific enough for our purposes and that there was no need for the circuit court judge to make specific findings as to the State’s explanations for each such peremptory challenge. “In both of those cases, we noted that the record contained the prosecutor’s explanations for the separate challenges made to the minority members of the venire, and, in reviewing in each case the trial judge’s findings of no discriminatory intent, we considered the explanations provided by the prosecution.” 
Harris II
, 164 Ill. 2d at 335. If our review of a 
Batson 
claim may proceed in the absence of specific findings by the circuit court as to each minority person challenged by the State, we see no reason why, in a case where the judge does make specific findings, we should be limited only to those findings and prevented from independently considering explanations provided by the State but not expressly ruled on by the judge.

Our decision in 
People v. Williams
, 164 Ill. 2d 1 (1994), is exactly on point as to this issue. Following the trial court judge’s decision that defendant had made a 
prima facie
 case with regard to the exclusion of Alvin Pettigrew, an African American venireperson, the State in 
Williams
 then provided its reasons for exercising a peremptory challenge against Pettigrew. The first two of these reasons were that Pettigrew kept his hat on during 
voir dire
, which the prosecutor said she thought was disrespectful, and that Pettigrew gave short, cryptic answers to the questions asked. The judge mentioned each of these reasons in finding that the State’s explanation was legitimate and race-neutral. However, the judge did not mention the third reason provided by the State: “Pettigrew’s lack of knowledge concerning the employment of one of his four children, a 24-year-old son who, he said, ‘[w]orks downtown somewhere.’ ” 
Williams
, 164 Ill. 2d at 20. Nevertheless, this court proceeded to consider this reason and concluded: [It] “appears to be a legitimate, race-neutral one. The 
record
 makes plain that the finding of the circuit court is not clearly erroneous.” (Emphasis added.) 
Williams
, 164 Ill. 2d at 21. Just as this court in 
Williams
 examined a reason not explicitly ruled upon by the trial judge, so here we have considered the reasons advanced by the prosecutor for excluding Shealy, including those not explicitly ruled upon by the trial judge. Based on our review of these reasons, we cannot say that the judge’s determination that they were legitimate and race-neutral is clearly erroneous.
 Hernandez v. New York
, 500 U.S. 352, 364-65, 369, 114 L. Ed. 2d 395, 409, 412, 111 S. Ct. 1859, 1869, 1871 (1991); 
Wiley
, 165 Ill. 2d at 274; 
Harris II
, 164 Ill. 2d at 333. We therefore reject defendant’s 
Batson 
claim as to the exclusion of venire member Edward Shealy.

Because defendant’s 
Batson 
claims as to Shealy and Brown are meritless, defendant has failed to show that he suffered prejudice as a result of his counsel’s failure to establish the race of Shealy and Brown. Even if counsel had established the race of these two venirepersons, defendant has not demonstrated that “there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” 
Strickland
, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. In other words, even if this court had considered the State’s exclusion of Shealy and Brown, it is not reasonably probable that the court would have found the State’s reasons to be pretextual or that the trial judge’s determination that the reasons were race-neutral was clearly erroneous. Defense counsel’s failure to establish the race of Shealy and Brown did not constitute ineffective assistance of counsel. See 
Strickland
, 466 U.S. at 697, 80 L. Ed. 2d at 699-700, 104 S. Ct at 2069; 
Morgan
, 187 Ill. 2d at 530.

Defendant makes an additional 
Batson
 claim regarding defense counsel’s failure to establish the race of Christine Riley Brown. According to defendant, Brown is a “Black Latina” and is therefore one of three Hispanic members of the venire, two of whom (Brown and Eva Morales) were peremptorily challenged by the State. Defendant contends that if defense counsel had established Brown’s Latina heritage, there is a reasonable probability that in 
Harris II 
this court would have found a 
prima facie 
case of discrimination against Hispanic venire members. In 
Harris II
 we held that defendant failed to establish such a 
prima facie
 case, based in part on “the apparent presence of only one Hispanic in the venire.” 
Harris II
, 164 Ill. 2d at 344. Defendant argues that this court’s decision might have been different if we had known that Riley was also Hispanic and that the State thus had peremptorily challenged two of three Hispanic venire members, or 66%. We disagree.

In order to establish a 
prima facie
 case of purposeful discrimination under 
Batson
, a defendant must show that the relevant facts and circumstances “raise an inference that the prosecutor used [peremptory challenges] to exclude the veniremen from the petit jury on account of their race.” 
Batson
, 476 U.S. at 96, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723. In other words, the defendant must show that “the totality of the relevant facts gives rise to an inference of discriminatory purpose.” 
Batson
, 476 U.S. at 94, 90 L. Ed. 2d at 86, 106 S. Ct. at 1721.

This court has enumerated a number of factors that are relevant in determining whether a 
prima facie 
case of purposeful discrimination in jury selection has been established. These factors include:

“a ‘pattern’ of strikes against [minority] jurors; ‘the prosecutor’s questions and statements during 
voir dire
 examination and in exercising his challenges’ [citation]; the disproportionate use of peremptory challenges against [members of a minority] [citations]; the level of [minority] representation in the venire as compared to the jury [citations]; whether the excluded [minority members] were a heterogeneous group sharing race as their only common characteristic [citation]; the race of the defendant and victim [citations]; and the race of the witnesses [citation].” 
People v. Evans
, 125 Ill. 2d 50, 63-64 (1988).

In the case at bar, defendant contends that there were three Hispanic members of the venire (Brown, Lucio Martinez, and Eva Morales) and that the State used peremptory challenges to remove two of them, Brown and Morales. The State thus used peremptory challenges to remove 66% of the Hispanic members of the venire. However, “[s]imply because [minority] veniremen are peremptorily challenged does not, without more, raise the specter or inference of discrimination.” 
Evans
, 125 Ill. 2d at 64, citing 
Batson
, 476 U.S. at 101, 90 L. Ed. 2d at 91, 106 S. Ct. at 1725 (White, J., concurring) (“it is not unconstitutional, without more, to strike one or more blacks from the jury”); 
People v. Hooper
, 118 Ill. 2d 244, 248 (1987) (Ryan, J., specially concurring) (the court must avoid arbitrarily deciding this delicate question “solely from the number of blacks peremptorily excused as disclosed by the record”).

Defendant does not contend here that the prosecutor, in exercising peremptory challenges against Hispanics, made statements indicating discriminatory intent. More importantly, neither defendant nor his two victims, one of whom was the State’s chief witness, were Hispanic. All three of them were African Americans. We are aware that a criminal defendant may bring a 
Batson
 claim “whether or not the defendant and the excluded jurors share the same race.” 
Powers v. Ohio
, 499 U.S. 400, 402, 113 L. Ed. 2d 411, 419, 111 S. Ct. at 1364, 1366 (1991). However, even though racial identity is not required in order to bring the claim, such identity, or lack thereof, “remains a relevant factor in determining whether a 
prima facie
 case of discrimination has been established.” 
People v. Pasch
, 152 Ill. 2d 133, 163 (1992); 
People v. Andrews
, 146 Ill. 2d 413, 425 (1992). In 
Harris II
 this court held that defendant had failed to establish a 
prima facie 
case of discrimination with regard to an excluded Hispanic venire member. In reaching this decision, the court stated: “The defendant was of a different ethnic group, and there would have been no likely reason for the prosecutor to have attempted to discriminate against Hispanics.” 
Harris II
, 164 Ill. 2d at 344. We draw the same conclusion here as to the racial-identity factor.

Based on our review of the record, we conclude that the totality of the relevant facts does not give rise to an inference of discriminatory purpose on the part of the State. See 
Batson
, 476 U.S. at 93, 94, 90 L. Ed. 2d at 85-86, 106 S. Ct. at 1721. Even if defense counsel had established Brown’s Hispanic heritage, a 
prima facie
 case of discrimination against Hispanic venire members would not have been established. Accordingly, defendant has failed to show that he suffered prejudice as a result of his counsel’s failure to establish Brown’s Hispanic heritage. 
Strickland
, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. Defense counsel’s alleged error here did not constitute ineffective assistance of counsel. 
Strickland
, 466 U.S. at 697, 80 L. Ed. 2d at 699-700, 104 S. Ct. at 2069; 
Morgan
, 187 Ill. 2d at 530.

Defendant’s 
Batson 
claim is without merit. Accordingly, the trial court correctly dismissed defendant’s post-conviction 
Batson 
claim without an evidentiary hearing.

II. Motion to Suppress

Defendant next argues that his counsel mishandled his pretrial motion to suppress evidence, thereby denying him the effective assistance of counsel. According to defendant, if counsel had effectively handled this motion, the gun that was allegedly taken from defendant at his arrest would have been suppressed and the State’s case without this evidence would have been insufficient to convict.

Prior to trial defendant moved to quash his arrest and suppress evidence, arguing that his conduct prior to the arrest did not constitute probable cause to suspect that he had committed or was about to commit a crime. A hearing was held in which three witnesses testified. We begin with a review of their testimony and the trial judge’s conclusions, along with relevant testimony given at trial by the same witnesses.

Cleveland Johnson, a Chicago resident who worked in a western suburb, testified at the hearing that on the morning of February 10, 1983, he was driving west on 63rd Street when, at about 4:15 or 4:25 a.m., he stopped at a traffic light at the intersection of 63rd and South State streets. While he was at the intersection, Johnson noticed a young man on foot who was headed north on State Street. The man, whom Johnson identified as defendant, stopped, turned, and looked back toward 64th Street. He then stepped around the corner, headed east, and stood behind a traffic control box. Johnson said he continued to watch defendant because he felt that there was “something wrong with this guy.” When the light changed, Johnson turned right and headed north on State Street. In his rearview mirror he saw defendant come across 63rd Street, step up onto the sidewalk, and start running north on State. Defendant, who was to the right of Johnson’s car, then hooked his left hand on the car’s right front door handle, and hit the car with his right hand. Johnson stopped the car and opened the passenger-side window a few inches. Defendant asked Johnson if he would take him to 51st Street, and he offered to pay five dollars for the ride. Johnson said, “No, I do not think so,” and defendant reached down and pulled up on the front of his pants at the waist.

Johnson testified further that at this point a Chevy Blazer drove up from behind and pulled in front of Johnson’s car. Two officers came out of the Blazer, one from the right-hand side and the other from the driver’s side. Both had guns. One of the officers came around the rear of Johnson’s car and pushed defendant over the car’s hood, telling him, “Don’t move.” The officer then took a gun from defendant’s belt. Johnson did not see the gun before the officer took it from defendant.

Michael Grady, who was employed as a railroad police officer for the Consolidated Railroad Corporation (Conrail), testified that on the morning of February 10, 1983, he and his partner, Theodore Kurzweil, were patrolling in their Chevy Blazer near the intersection of 63rd and South State streets. Sometime prior to 4:20 a.m., Chicago police officers drove up and gave the Conrail officers a description of a man they said was wanted for attempted armed robbery: “a male Black, approximately five-ten to six foot, in his twenties, wearing a blue jean jacket [and] blue jeans, [with a] large, bushy Afro-style hairdo.” The Chicago police officers said the man was armed with a small caliber handgun. They then drove away.

Grady testified further that a short time later, at about 4:20 a.m., he and his partner were at the intersection of 63rd and State streets when they saw a man whom Grady identified as defendant running alongside Johnson’s car. The car was moving north on State Street. According to Grady, defendant had a handgun “openly displayed” in his right hand, and his left hand was on the car’s passenger-side door. The Conrail officers turned north onto State Street and pulled in front of Johnson’s car, which by now had stopped about a half block north of 63rd on State. Grady and his partner got out of their vehicle with their guns drawn and arrested defendant, from whom they recovered the gun.

Kurzweil, who was driving the Blazer on February 10, gave essentially the same testimony. He stated that at about 4:20 that morning he saw a man whom he identified as defendant going north on State Street at 63rd Street. The man, who was alongside a moving car, had in his right hand what “appeared to be a revolver.” At that time defendant was wearing a blue jean jacket and blue jeans, and “[h]is hair was in a large Afro.”

At the conclusion of the hearing, the circuit court denied defendant’s motion to quash arrest and suppress evidence. The judge stated that there was probable cause to arrest defendant on either of two grounds: (1) “at a time closely connected with the [February 10, 1983] incident,” defendant matched the description given to the Conrail officers, or (2) defendant was observed carrying a handgun “within the City of Chicago.”

Evidence presented at trial included testimony from these same three witnesses–Cleveland Johnson and Conrail officers Michael Grady and Theodore Kurzweil. All three gave essentially the same testimony that they had given previously. With regard to the gun that Grady and Kurzweil had seen in defendant’s hand, Grady stated at trial that he observed defendant running alongside the car, with a gun in his right hand, and his arm extended to his right side. The gun was below the level of the car window. When Grady subsequently told defendant to drop the gun, defendant “[p]laced the weapon into his waistband.” Grady then recovered the gun from defendant, who was placed under arrest. Kurzweil gave similar testimony regarding the gun. Kurzweil stated that defendant “was running alongside [Johnson’s] car,” with a “revolver” in his right hand and his left hand “toward the car.” Grady subsequently recovered the gun from defendant.

With respect to the description of defendant given by Chicago police officers, Grady’s testimony at trial differed somewhat from his pretrial testimony. At the motion hearing, as noted, Grady stated that the officers told him “they were looking for a male Black, approximately five-ten to six foot, large Afro-style hair, wearing blue jean jacket, blue jeans, and armed with a small caliber handgun, wanted for Attempted Armed Robbery.” At trial, however, Grady gave the description as “Male black, wearing a blue jean jacket with a large ’fro.” Under cross-examination at trial, Grady conceded that when he stated during the motion hearing that the description included a height of “five, ten to six foot,” this was “conjecture” on his part.

As noted, Johnson’s testimony at trial was similar to his previous testimony. Johnson testified that he was in his car at the intersection of 63rd and State streets, stopped at a stop light, when he observed defendant acting suspiciously. Johnson turned right off 63rd and headed north on State, looked in his rearview mirror, and saw defendant running toward him, but saw nothing in defendant’s hands. Johnson subsequently lost sight of defendant in his rearview mirror, and when he saw him again, defendant was alongside Johnson’s car, on the right-hand side, with his left hand on the passenger door. Defendant hit the passenger door with his right hand, and Johnson stopped the car. Johnson could not see defendant’s hand when defendant hit the door. He saw only defendant’s “arm swinging.” A short time later, one of the officers recovered a gun from defendant.

Before this court, defendant argues that his counsel’s handling of the motion to suppress was deficient in three ways: (1) during the pretrial hearing on the motion to suppress, defense counsel failed to impeach Grady regarding his testimony as to the description that he was given by Chicago police; (2) during the trial, defense counsel failed to ask that the motion to suppress be reopened in light of Grady’s different testimony at trial regarding the description; and (3) after the trial, defendant’s newly appointed post-trial counsel failed to point to these deficiencies in trial counsel’s performance as a basis for granting defendant a new trial. Defendant contends in addition that “[t]o the extent that the issue could have been raised on direct appeal, [defendant] allege[s] that he was denied the effective assistance of appellate counsel.”

The State initially argues that defendant has waived this issue by failing to raise it either in post-trial motions or on direct appeal. As noted, the purpose of a post-conviction proceeding is to permit inquiry into constitutional issues involved in the original conviction and sentence that were not, and could not have been, adjudicated previously on direct appeal. 
People v. Haynes
, 192 Ill. 2d at 464; 
People v. Towns
, 182 Ill. 2d 491, 502 (1998). Issues that could have been presented on direct appeal, but were not, are waived. 
Haynes
, 192 Ill. 2d 437, 465 (2000); 
Towns
, 182 Ill. 2d at 503. However, the doctrine of waiver is relaxed where the alleged waiver stems from the incompetence of appellate counsel. 
People v. Mahaffey
, 194 Ill. 2d 154, 171 (2000); 
People v. Whitehead
, 169 Ill. 2d 355, 371 (1996). Here, defendant alleges not only that he was deprived of the effective assistance of trial and post-trial counsel, but also that his appellate counsel was ineffective for failing to raise the motion-to-suppress issue on direct appeal. We therefore address the merits of defendant’s claim. 
People v. Simms
, 192 Ill. 2d 348, 371-72 (2000).

Claims of ineffective assistance of appellate counsel are evaluated under the same two-prong standard set forth in 
Strickland
 for assessing claims of ineffective assistance of trial counsel. 
Haynes
, 192 Ill. 2d at 476; 
People v. Richardson
, 189 Ill. 2d 401, 412 (2000).

“ ‘A defendant who contends that appellate counsel rendered ineffective assistance, 
e.g.
, by failing to argue an issue, must show that the failure to raise that issue was objectively unreasonable and that the decision prejudiced the defendant. Appellate counsel is not obligated to brief every conceivable issue on appeal, and it is not incompetence of counsel to refrain from raising issues which, in his or her judgment, are without merit, unless counsel’s appraisal of the merits is patently wrong. Accordingly, unless the underlying issues are meritorious, defendant has suffered no prejudice from counsel’s failure to raise them on appeal. 
People v. Childress
, 191 Ill. 2d 168, 175 (2000); 
People v. West
, 187 Ill. 2d 418, 435 (1999) (and cases cited therein).’ ” 
Haynes
, 192 Ill. 2d at 476, quoting 
People v. Easley
, 192 Ill. 2d 307, 328-29 (2000).

The State argues that defendant cannot show 
Strickland
 prejudice here because, regardless of the merits of his insufficient-physical-description claim, the trial court judge found a separate, independent ground for denying defendant’s motion to suppress: defendant was observed with a handgun “in his hand, within the City of Chicago.” According to the State, defendant’s argument with regard to the physical description “in no way weakens the second and alternative finding that [the judge] made when he denied [defendant’s] motion to quash: Grady and [Conrail officer Theodore] Kurzweil had probable cause to arrest [defendant] as soon as they saw him running alongside [Cleveland] Johnson’s car with a gun in his hand, in what appeared to be an attempt to enter the car and harm the driver.”

With regard to this argument, defendant contends that Johnson “completely contradicted” Grady’s and Kurzweil’s testimony about the gun. Defendant points to Johnson’s testimony at the pretrial hearing and at trial, in which, according to defendant, Johnson stated that defendant “had not been carrying a gun.” Defendant notes that Johnson did not see the gun until one of the Conrail officers took it from defendant.

A careful reading of Johnson’s testimony at the pretrial hearing and at trial shows that Johnson did not “completely contradict” the Conrail officers’ testimony. In both his pretrial testimony and at trial, Johnson stated that he first saw the gun when it was in the officer’s hands. However, he clearly stated that the gun was taken from defendant. In his pretrial testimony, the following exchange took place between defense counsel and Johnson.

“MR. KUNZ [Assistant Public Defender]: Did you see a gun?

THE WITNESS [Johnson]: The officer got it from *** him. That is when I [saw] it.

MR. KUNZ: Did you see the officer take it from him?

THE WITNESS: I am looking at the officer when he pulled it up from his jacket.

* * *

MR. KUNZ: And, before the officer took the gun, you had not seen it?

THE WITNESS: No.

MR. KUNZ: Was it hidden by his jacket? Had it been hidden by his jacket?

THE WITNESS: It had to be, because I did not see it.”

Johnson gave similar testimony at trial, but he provided additional details. The following colloquy took place between the prosecutor and Johnson.

“MR. FRANKS [Assistant State’s Attorney]: Describe the gun that you saw taken from the defendant?

THE WITNESS: It was a small caliber, dark gun. Looked to me like it was a .32.

MR. FRANKS: When the officer was touching the defendant or frisking him, did that officer–

* * *

MR. FRANKS: Did that officer have a gun in his hands at that moment?

THE WITNESS: No.

MR. FRANKS: Did you see that gun then for the first time when it was in the officer’s hands?

THE WITNESS: That’s the first time I [saw] it.

* * *

MR. FRANKS: Where was the gun taken from?

* * *

THE WITNESS: He [took] the gun from under the man’s jacket where it was pushed down the waist of his pants.

MR. FRANKS: Did the officers [
sic
] have anything in his hands before he put his hands in the defendant’s waist area?

THE WITNESS: Yeah, he put his gun away and then he put his hands on the man and started patting him down.

MR. FRANKS: At the time he was patting him down, the officer had put his gun away?

THE WITNESS: That’s right.

MR. FRANKS: He had nothing in his hands at that time?

THE WITNESS: That’s right.”

Contrary to defendant’s contention, Johnson made no explicit assertion that defendant was not carrying a gun. Rather, as noted, Johnson’s testimony indicated that he did not see the gun until one of the officers took it from defendant. This is consistent with what Grady and Kurzweil stated, particularly in light of Grady’s testimony that the gun that the officers saw in defendant’s right hand was below the level of the car window. This explains why Grady and Kurzweil, who were driving behind Johnson’s car, were able to see the gun and Johnson was not. In addition, while Johnson stated that he first saw the gun when it was in the officer’s hand, Johnson never wavered from his assertion that the gun was taken from defendant. We note in particular Johnson’s testimony that he saw the officer put his own gun away before he searched defendant, and that the officer had “nothing in his hands” at that time. This appears to counter any suggestion that it was the officer who placed the gun in defendant’s waistband.

Defendant has failed to show that he suffered prejudice from any deficiency on the part of his trial counsel, post-trial counsel or appellate counsel in handling the motion to suppress. The circuit court had a valid basis for finding that there was probable cause to arrest defendant, and the court did not err in denying defendant’s motion to suppress. There is thus no merit in defendant’s claim that his trial counsel and post-trial counsel were ineffective. Further, because this underlying claim lacks merit, it was not incompetence on the part of appellate counsel to refrain from raising this issue on direct appeal. The appraisal of this issue by defendant’s appellate counsel was not “ ‘patently wrong.’ ” 
Haynes
, 192 Ill. 2d at 476, quoting 
Easley
, 192 Ill. 2d at 329; 
Richardson
, 189 Ill. 2d at 412. Accordingly, the trial court correctly dismissed this specific post-conviction claim without an evidentiary hearing.

III. Second Capital Sentencing Hearing

The remainder of defendant’s claims refer to his second capital sentencing hearing, which was conducted on remand from 
Harris I
. We consider each of these claims in turn.

A. 
Testimony of Phyllis Ham Garth

Defendant argues that his counsel was ineffective for failing to call former Chicago police officer Phyllis Ham Garth as a witness during the eligibility phase of his second capital sentencing hearing. Defendant contends that Garth’s testimony would have impeached the credibility of Theresa Woods, the State’s chief witness, regarding whether defendant possessed the mental state required to render him death eligible. Section 9–1(b)(6)(b) of the Criminal Code of 1961 provides that a defendant may be sentenced to death if he “killed the murdered individual 
intentionally
 or with the 
knowledge
 that the acts which caused the death created a strong probability of death or great bodily harm.” (Emphases added.) Ill. Rev. Stat. 1981, ch. 38, par. 9–1(b)(6)(b).

We begin with a review of portions of the testimony given at trial and at the second sentencing hearing, along with relevant argument of counsel and findings of the trial court in the sentencing hearing. At trial, Woods testified that on February 10, 1983, she and her employer, Jesse James, Sr., closed his tavern at about 2 a.m. and left the premises together between 3:30 and 4 o’clock that morning. As they walked to their cars, they were approached by defendant, who grabbed Woods and pointed a gun at her head. Following defendant’s instructions, James got into the driver’s seat of his car, and Woods sat in the back seat on the driver’s side. Defendant, who sat in the front passenger’s seat, then ordered James to drive a short distance and park in a nearby alley. Once they had parked, defendant demanded $300 from James and Woods, threatening to kill them if they did not comply. Defendant explained that if he was caught he was going back to jail “for good,” so it did not matter if he killed them.

James told defendant that he had some money back at the tavern, so they returned to that area and parked in the mouth of an alley with the car facing outward toward the street. Defendant told Woods to go to the tavern and get the money, and he warned her that he would kill James if she did not return within three minutes. Woods then ran into the tavern, grabbed paper currency from the cash register, and went back outside. Emerging from the tavern, she noticed that the car had pulled out of the alley and was parked next to the curb. Woods walked to the driver’s side of the car, and defendant, who was still in the front passenger seat next to James, told her to get into the vehicle. James objected, asking why Woods had to get back in the car. Defendant told James to “shut up” and that “he was running this.” According to Woods, defendant then pulled James toward him so they were facing each other, and defendant shot James.

Woods attempted to run away from the car. As she was running she heard another gunshot and tripped and fell. She landed on her left side and rolled over onto her back. When she looked up, she saw defendant standing over her with the gun. Defendant said, “You bitch.” Woods raised her hand to protect herself, pleading with him not to shoot, and rolled over onto her stomach. Woods heard another shot and then lay motionless, pretending to be dead. A short time later she heard footsteps running from the scene. Woods got up, saw that James was still alive, and noticed that the car had crashed into the window of a nearby storefront. She then ran into the tavern and called the police. It was then that she noticed she had been shot. The wound was in her right shoulder.

Also testifying at trial was Chicago police detective Geraldine Perry, who gave a somewhat different account of the incident. According to Perry, who spoke to Woods at Billings Hospital the day of the incident, Woods told Perry that when she emerged from the tavern with the money, she saw the car moving down the street and saw “some movement in the front seat of the car.” As Woods watched, she saw the car crash into the storefront. Woods did not tell Perry that she approached the driver’s side of the car or that she heard any words spoken by James or defendant.

At defendant’s second sentencing hearing, Woods gave essentially the same testimony that she gave at trial. She stated that when she emerged from the tavern with the money, the car in which Jesse James, Sr., and defendant were seated had already moved out of the alley and was parked next to the curb. Woods did not see the car moving, nor did she see the two persons in the front seat struggling. Woods also did not see the car go up over the curb and crash into the storefront window. It was not until after she had been shot that she noticed the car “had moved up into the building.”

In order to impeach this testimony by Woods, the defense called Detective Perry, who also gave essentially the same testimony that she gave at trial. According to Perry, Woods said that when she emerged from the tavern, she observed the car moving slowly along the street, and she saw movement of the two persons in the front seat. Woods also told Perry that she saw the car go up over the curb and crash into the storefront window.

During argument in the first phase of the sentencing hearing, defense counsel referred to this testimony by Perry and stated:

“[It] suggests that there was a struggle going on in the car and that is certainly corroborated by the fact that the car rolled forward and crashed into a window. It contradicts any suggestion by the State’s witness that this was in any way, shape, or form a cold-blooded killing.”

In rebuttal, the State offered a different explanation. According to the State, it was reasonable to infer that the car was in gear when James was shot and that “[t]he car simply moved as cars will move when [an] automatic transmission is in gear[,] and [it] went up the curb and bumped in the window and cracked the window. *** It does not mean that somebody was driving that car wildly after the shot was fired.”

At the conclusion of this phase of the sentencing hearing, the judge found defendant eligible for the death penalty. He stated: “The Court’s finding of eligibility will stand.”

Before this court, defendant argues that his counsel was ineffective for failing to call former police officer Garth as a witness at the second sentencing hearing. Defendant contends that Garth’s testimony “would not only have impeached the credibility of Woods’ testimony but it also could have provided substantive evidence (under the excited utterance-spontaneous declaration exception to the rule against hearsay) that the shooting was a negligent or accidental act rather than an intentional or knowing one.” Attached to defendant’s amended post-conviction petition are a February 10, 1983, police report prepared by Officer Phyllis Ham (now Garth) and a “second affidavit” of State Appellate Defender’s office investigator Jonathan Lyon. According to these attachments, Garth and her partner were the first officers on the scene of the February 10, 1983, incident. Garth interviewed Woods, who Garth said was “upset,” and Garth was told by Woods that “when she came out of the bar she observed a struggle inside the car after which the car crashed into a building.” Defendant argues that if Garth’s testimony had been presented, it is reasonably probable that the judge at the sentencing hearing “would have found that the State had failed to prove the requisite mental state beyond a reasonable doubt.”

The State initially contends that defendant made “[v]irtually” the same claim on direct appeal in 
Harris II
 and that this court’s decision as to this claim is 
res judicata
 as to this issue. In 
Harris II
, defendant argued that his counsel was ineffective for failing to present Detective Perry’s testimony “as substantive evidence under the excited utterance exception to the hearsay rule” (
Harris II
, 164 Ill. 2d at 348), rather than merely as impeachment of Woods’ testimony. This court rejected defendant’s ineffective assistance argument, concluding that defendant had failed to show that he was prejudiced by his counsel’s failure to offer Perry’s testimony as substantive evidence at the sentencing hearing. 
Harris II
, 164 Ill. 2d at 349.

The purpose of a post-conviction proceeding is to allow inquiry into constitutional issues that have not been, and could not have been, adjudicated previously on direct appeal. Accordingly, determinations of a reviewing court on the prior direct appeal are 
res judicata
 as to issues actually decided. 
Towns
, 182 Ill. 2d at 502; 
Whitehead
, 169 Ill. 2d at 371. While defendant’s argument in the case at bar is similar to the argument he raised about the Perry testimony in 
Harris II
, the two contentions are not the same. In 
Harris II
, defendant argued that Perry’s testimony, which had already been presented as impeachment, should have been offered as substantive evidence as well. In other words, Perry’s testimony would have carried more weight had it been introduced as substantive evidence. In the case at bar, defendant argues, similarly to his previous contention, that Perry’s testimony should have carried more weight, but here the device by which the weight is to be added is different. In this instance, unlike 
Harris II
, defendant complains that Garth’s testimony was not presented at all. If it had been, defendant contends, it would have corroborated Perry’s testimony and would have thereby given it greater weight. Because of this distinction between these contentions, we conclude that defendant’s argument in the case at bar was not “actually decided” in 
Harris II
, and 
res judicata 
does not apply. We therefore consider the merits of defendant’s claim.

Under the 
Strickland 
standard, a defendant must establish not only that his counsel’s performance was deficient, but also that the defendant suffered prejudice as a result. 
Morgan
, 187 Ill. 2d at 529-30. Prejudice is shown if the defendant establishes “that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” 
Strickland
, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

We agree with defendant that Garth would have been a separate witness from Perry, and that Garth’s testimony would have recounted a different interview with Woods. However, the gist of Garth’s testimony would have been exactly the same as Perry’s: that Woods, upon emerging from the tavern, observed a struggle inside the car and saw the car crash into the storefront. Even if Garth’s testimony had been presented, it is not reasonably likely that the judge at the second sentencing hearing would have accepted defendant’s theory that the shooting was accidental.

In considering defendant’s similar claim in 
Harris II
, we stated: “the prosecutor explained at the sentencing hearing [that] the more reasonable inference from the description of the offenses provided by Woods to police was that James was shot while the car was in gear, and that the vehicle rolled forward when the driver lost control.” 
Harris II
, 164 Ill. 2d at 349. In addition, we stated:

“Other evidence established that the shooting was not accidental. The defendant initially threatened to kill James and Woods because, he said, he had ‘nothing to lose.’ When Woods reentered the tavern to obtain money, the defendant said that he would kill James if she did not return shortly. When Woods came back to the car, the defendant rejected James’ plea that Woods be allowed to go, saying that he was ‘running this.’ After James was shot, the defendant straddled Woods, said to her, ‘You bitch,’ and shot her at close range.” 
Harris II
, 164 Ill. 2d at 349.

At the conclusion of the second sentencing hearing, the circuit court judge stated that the murder of James was “ ‘totally unnecessary,’ ” suggesting that he did not accept defendant’s accident theory. 
Harris II
, 164 Ill. 2d at 347-48. The judge made this comment after hearing Perry’s testimony in support of this theory during the first phase of the hearing. Garth’s testimony, if presented, would have been to the same effect as Perry’s. Given the “other evidence” establishing that the shooting was not accidental, it is not reasonably probable that Garth’s testimony would have altered the result of the proceeding.

Notwithstanding the foregoing, defendant points to 
People v. Pugh
, 157 Ill. 2d 1 (1993). In 
Pugh
, as in the case at bar, the defendant contended that his shooting of the victim was accidental and that his counsel was ineffective for failing to present evidence that he lacked the culpable (intentional or knowing) mental state required to render him eligible for the death penalty. We held in 
Pugh
 that the defendant was prejudiced by his counsel’s errors, and we vacated his death sentence.

Pugh 
is distinguishable from the case at bar. In 
Pugh
, the defendant entered a blind plea of guilty to felony murder, and he stipulated to his eligibility for the death penalty. This stipulation was entered based on defense counsel’s incorrect belief that a finding of felony murder by itself rendered the defendant eligible for the death penalty. Defense counsel was unaware that the State also was required to prove that the defendant possessed the culpable mental state of intent or knowledge. Accordingly, “[n]one of defendant’s evidence was presented by defense counsel at the first phase of sentencing because counsel believed such evidence was irrelevant once felony murder was established.” 
Pugh
, 157 Ill. 2d at 20.

Here, by contrast, there was no misapprehension of the law on the part of defense counsel, nor was there any stipulation that defendant was eligible for the death penalty. Defendant in the instant case does not allege that counsel presented 
no
 evidence during the eligibility phase of the sentencing hearing. Rather, he complains that counsel did not augment the testimony that 
was 
presented by calling an additional witness who would have testified to precisely the same effect as did Perry. Given the “other evidence” establishing that the shooting was not accidental, we do not believe that defendant has shown that he was prejudiced by counsel’s failure to augment Perry’s testimony with Garth’s. Therefore, the trial court correctly dismissed this post-conviction claim without an evidentiary hearing.

B. 
Brady claim

Defendant argues that portions of the testimony of one of the State’s witnesses in aggravation were false and that the State knew this testimony was perjurious. Defendant also contends that the State failed to disclose medical records showing that the testimony was false and thus violated the United States Supreme Court’s decision in 
Brady v. Maryland
, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). Defendant’s claim focuses on the testimony of John Szumigala, the victim of a 1971 robbery for which defendant received a four- to eight-year prison sentence. Szumigala testified at the sentencing hearing that defendant severely beat him during the 1971 robbery, and that as a result Szumigala sustained numerous injuries, both immediate and long-term. According to defendant, Szumigala’s hospital records, which were not disclosed by the State, demonstrate that Szumigala exaggerated the extent of his injuries in his testimony.

We begin with a review of Szumigala’s testimony at the 1992 sentencing hearing, along with other relevant evidence and the judge’s conclusions. At the sentencing hearing, Szumigala stated that in February 1971 he was a 17-year-old student at the Goodman Theater in Chicago. At about 7:45 p.m. on February 19, 1971, he was crossing the Jackson Street bridge en route to the theater when he was approached by six young men, one of whom was defendant. According to Szumigala, defendant walked up and punched Szumigala in the stomach, and two others grabbed him and dragged him under the bridge. The group robbed him of $40, a watch, two rings, and a coat. Defendant then punched Szumigala in the stomach several more times. At about this time, one of the other young men in the group told defendant that they had what they wanted and should leave. According to Szumigala, defendant replied: “No. I’m going to kill this guy.” Defendant then slammed Szumigala’s head into a brick wall, kicked him in the right eye, and kicked him again in the nose and forehead. Another member of the group rolled Szumigala over and said, “He’s dead.” Szumigala then “played dead” until he was sure the group was gone. He was subsequently taken to the hospital.

Szumigala said his hands were “very badly cut up,” his shoulders were “pretty well scraped,” and he had “absolutely blurred vision” in his right eye. According to Szumigala, his right eye had been forced up into its socket, with pieces of stone and gravel lodged in the eye and the eye canal. A surgical procedure was performed to remove “the rocks and rubble out of the eye and out of the eye canal.” In addition, Szumigala’s right shoulder was dislocated and “was put back into [its] socket at the hospital that night.” Szumigala added that his fingers, his right knee, and his right ankle were dislocated.

Testifying further at the sentencing hearing, Szumigala described the long-term effects of the 1971 incident. He said he had difficulty distinguishing certain colors, and this had prevented him from pursuing his chosen career as a costume and set designer. Szumigala added that, since the incident, he has suffered recurring, “almost violent” headaches, as well as chronic dislocation of his right shoulder. In addition, he lost “a great deal of dental work on the right side of [his] face.” According to Szumigala, his teeth had to be wired following the beating. He also stated that he has difficulty reading for more than half an hour at a time because of pressure on his eyes.

Defense counsel attempted to impeach Szumigala with his 1971 testimony at trial in the robbery case. Szumigala was asked whether, during that testimony, he had stated that one of the young men who attacked him had said he was going to kill him. Szumigala answered that he had said that. However, the State stipulated that such a statement did not appear in the transcript of the 1971 testimony.

The State introduced into evidence a certified statement of defendant’s conviction in the Szumigala robbery, as well as a certified statement of his conviction for a 1970 burglary for which he was sentenced to five years’ probation. Also introduced were certified statements of defendant’s convictions in two armed robberies.

Defendant himself made a statement on his own behalf during the sentencing hearing. He essentially denied having committed the present offenses, assuring the court repeatedly that he was not a violent person. On cross-examination, defendant was questioned about the 1971 robbery of John Szumigala. Defendant acknowledged that he was present at the scene on the night of the robbery. According to defendant’s version of the incident, defendant was alone on February 19, 1971, when Szumigala approached him and said something that provoked a fight. In the course of the fight, defendant kicked Szumigala in the face. When asked how many times he kicked Szumigala in the face, defendant responded: “It couldn’t have been no more than once.” Defendant asserted that once he had won the fight, he left.

At the conclusion of the evidence and argument, the trial court sentenced defendant. The judge referred to evidence presented in mitigation regarding defendant’s childhood and family, observing that “there are some rips and tears in the canvas of his life” such as the “violence between his mother and father” that are “certainly negatives in Mr. Harris’ life.” However, the judge pointed to testimony from defendant’s sister that none of the other children in the family were convicted of felonies. The judge stated: “[N]o one else *** found that based upon that family life *** they must go out and commit crimes and be involved in criminal activity.”

Turning to the killing of James in 1983, the judge stated: “[D]espite Mr. Harris’ indication on the stand that he did not commit this offense, based upon the records, based upon my opportunity to observe the *** surviving witness who testified, Ms. Woods, there is no question in this court’s mind *** that Mr. Harris did in fact kill Mr. James and that he in fact shot Ms. Woods.” The judge called defendant’s murder of James “totally unnecessary.” The judge also referred to “the beating that was administered to” John Szumigala “20 some years ago.” He termed defendant’s explanation of this incident “just unbelievable.”

In sentencing defendant, the trial court judge stated:

“I have searched this record. I have searched my mind. I have listened [to] and looked at Mr. Harris. I have looked at his art work. I have listened to his family, looking, searching, and hoping in all candor that there would be some mitigating circumstance to preclude the imposition of the death penalty. Despite that diligent search, I have been unable to find any such mitigating circumstance.”

Accordingly, the trial court sentenced defendant to death for the murder of James.

Before this court, the State contends that defendant waived his 
Brady 
claim by failing to file a post-sentencing motion following the second sentencing hearing. Defendant concedes that no such motion was filed. Ordinarily, waiver would apply. 
People v. Szabo
, 113 Ill. 2d 83, 93 (1986). However, as noted, the rules of waiver are relaxed where the facts relating to the claim do not appear on the face of the original appellate record. 
Mahaffey
, 194 Ill. 2d at 171. Here, the facts forming the core of defendant’s claim are in Szumigala’s medical records, which first appeared in the record as an attachment to defendant’s amended post-conviction petition. We therefore address the merits of defendant’s claim.

Szumigala’s medical records from Henrotin Hospital, where he was treated after the robbery, provide little or no support for many of his injury claims. The records show that Szumigala complained of pain in his right shoulder in the emergency room, but the only reference to dislocation is a notation that his right shoulder had been dislocated one year earlier. There does not appear to be any indication that the shoulder was dislocated when he was admitted to the hospital, or that hospital personnel put it back into its socket.

The “Physical Examination” section of the records lists major areas of the body, with notes next to each area that was injured. Next to “Head-Eyes,” the records note the “presence of an abrasion at the occipital region, right upper and lower eyelids with hematoma, small lacerations of the right upper eyelid, subconjunctival hemorrhage present, 
vision not impaired
.” (Emphasis added.) Regarding other areas of the body, the notes indicate, 
inter alia
, “tenderness and discoloration at the right side of the nose,” “hematoma upper lip with laceration,” and “slight tenderness” to the xiphoid, or breast bone. There are no notes of injuries next to “Skin,” despite Szumigala’s testimony that his hands were cut and his shoulders were abraded, or next to “Bones-Joints-Muscles,” despite Szumigala’s testimony that his right knee, shoulder and ankle were dislocated. In addition, though Szumigala testified at the sentencing hearing that defendant punched him in the stomach numerous times, the notation next to “Abdomen” states: “non-remarkable.”

There also does not appear to be any indication in the medical records that Szumigala’s eye was out of place, or that a surgical procedure was required to repair injuries. In addition, despite Szumigala’s testimony that he suffered “blurred vision” in his right eye, the notation next to “Head-Eyes” stated: “vision not impaired.” A similar notation appeared in the “Progress Notes” section, which stated that, as of February 20, 1971, the day after the robbery, Szumigala had “no headache or dizziness or any visual disturbance.”

As previously noted, defendant also attached to his amended post-conviction petition an opinion letter from a physician stating that the medical records did not support Szumigala’s allegations regarding his long-term injuries. This letter, by Burton Russman, M.D., stated:

“There is no evidence in the records that [Szumigala] had any specific eye injury other than a laceration of the lid, as well as a subconjunctival hemorrhage and some contusions about the eye. X-rays were completely negative for any fractures, and it was stated in the records that ‘He has no headache or dizziness or any visual disturbance.’ *** When he was discharged from the hospital, the discharge note was as follows: ‘No complaints, alert and oriented, swelling much better, doing fine, to go home now.’ As to Mr. Szumigala’s alleged loss of color vision, there is no evidence that he had such a loss, nor evidence to show that he had any peripheral field of vision loss. *** In short, I do not find that the records bear out the allegations of Mr. Szumigala’s permanent injury, as they 
would certainly have appeared by the time he was discharged from the hospital
.” (Emphasis added.)

The United States Supreme Court held in 
Brady 
that the State has an affirmative duty in a criminal prosecution to disclose evidence favorable to a defendant, where the evidence is material either to guilt or to punishment. 
Coleman
, 183 Ill. 2d at 391; 
Brady
, 373 U.S. at 87, 10 L. Ed. 2d at 218, 83 S. Ct. at 1196-97. There are three situations to which the general rule of 
Brady
 applies. 
People v. Simms
, 192 Ill. 2d 348, 388-89 (2000); 
Coleman
, 183 Ill. 2d at 391. In the first, the undisclosed evidence demonstrates that the prosecution’s case includes perjured testimony and that the prosecution knew, or should have known, of the perjury. In this situation, the test for materiality is whether there is any reasonable likelihood that the false testimony could have affected the judgment. 
Simms
, 192 Ill. 2d at 389. The second situation is characterized by a pretrial request for specific evidence followed by the prosecution’s noncompliance with the request. In the third situation, the defense makes either no discovery request or only a general request for “
Brady
” material, and exculpatory matter is withheld by the State. “In the second and third situations, favorable evidence is material and constitutional error results from its suppression by the government, if the evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.” 
Simms
, 192 Ill. 2d at 389. In addition, “the cumulative effect of the suppressed evidence also informs the materiality determination.” 
Simms
, 192 Ill. 2d at 389; 
Coleman
, 183 Ill. 2d at 393.

In situations such as the case at bar that involve both the use of perjured testimony and the failure to disclose 
Brady
 material, the test for materiality is the former of the two tests set forth above: whether there is any reasonable likelihood that the false testimony could have affected the judgment. We explained in 
Coleman
 why it is this standard, which is more lenient to the defendant, that is to be applied in such situations:

“[W]here undisclosed 
Brady 
material undermines the credibility of specific testimony that the State otherwise knew to have been false, the standard of materiality applicable to the first [
United States v.
] 
Agurs
[, 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976),] category applies. In such circumstances, the failure to disclose is ‘part and parcel of the presentation of false evidence to the jury and therefore “corrupt[s] *** the truth-seeking function of the trial process,” [citation] and is a far more serious act than a failure to disclose generally exculpatory material.’ 
United States v. Vozzella
, 124 F.3d 389, 392 (2d Cir. 1997). Therefore, the standard of materiality in this case is whether there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.” 
Coleman
, 183 Ill. 2d at 394.

In the instant case, we may affirm the circuit court’s decision to dismiss defendant’s 
Brady 
claim without an evidentiary hearing only if we can conclude, as a matter of law, that Szumigala’s allegedly false testimony does not fall within this strict standard of materiality. 
Simms
, 192 Ill. 2d at 391; 
Coleman
, 183 Ill. 2d at 394.

In considering this question, we note that Szumigala, who was a prominent witness
(footnote: 2) in aggravation, provided damaging testimony. While the State presented evidence that defendant had numerous prior convictions, Szumigala’s testimony provided the only evidence that defendant had injured another person prior to the shooting of James and Woods. Szumigala’s testimony thus provided the only evidence that defendant was a chronically violent offender.

Excluding Szumigala’s testimony, the evidence in aggravation and mitigation that was presented at the sentencing hearing was closely balanced. The evidence in mitigation included the testimony of seven witnesses, three of whom were correctional officers who had contact with defendant. In addition, a report prepared by a mitigation specialist was admitted into evidence, as were two letters in support of defendant, one from a daughter and the other from his mother-in-law. The correctional officers described defendant as a “model inmate” and “a very good prisoner.”

Another factor bearing on our decision regarding the 
Brady 
claim is the judge’s comments during sentencing. In explaining his decision to impose the death penalty, the judge specifically mentioned Szumigala’s testimony. The judge stated:

“The conduct on the bridge on Jackson Street some 20 years ago, the beating that was administered to this individual, the comments that Mr. Szumigala had testified about other people saying we got what we want and let’s go, and the defendant’s position that I am going to kill this guy, the defendant’s indication to me in open court or indication to [Assistant State’s Attorney] Mr. Meyer in response to questions that he didn’t do that, that this was just an encounter[,] that it was a fair fight and that he happened to win[,] is just unbelievable.”

Having reviewed the entire transcript, we cannot say that “there exists no reasonable likelihood that the allegedly false testimony [c]ould not have affected the [judge’s decision] to impose the death penalty.” 
Simms
, 192 Ill. 2d at 392.

Notwithstanding the foregoing, the State argues that it did not allow false testimony to stand uncorrected. The State contends that Szumigala’s medical records do not establish that his testimony was false. In addition, the State challenges Russman’s affidavit, asserting that it “would be probative only if Russman could state that, based on his own examination of Szumigala and his own medical knowledge, Szumigala could not possibly have suffered the injuries that he claimed.”

In making these arguments, the State is contesting the truth of defendant’s allegations that Szumigala gave false testimony and that Szumigala’s medical records demonstrate that this testimony was false. The difficulty with the State’s contentions is that they ignore the procedural posture of this case. As noted, this appeal is before us as a result of the circuit court judge’s dismissal of defendant’s amended post-conviction petition without an evidentiary hearing. This action by the judge came in response to the State’s motion to dismiss the petition. By seeking to dismiss the petition, as opposed to answering it, the State assumed the truth of the factually supported allegations contained in the petition, at least for purposes of the motion. 
Coleman
, 183 Ill. 2d at 390; 
Towns
, 182 Ill. 2d at 503; 
Brisbon
, 164 Ill. 2d at 244-45. The State, as movant, thus eliminated all factual issues from the inquiry, and the sole question remaining is whether the petition’s allegations are sufficient, as a matter of law. 
Coleman
, 183 Ill. 2d at 390. It is premature for the State to contest factual matters at this juncture. Such determinations are to be made at the evidentiary stage of the post-conviction proceeding. 
Coleman
, 183 Ill. 2d at 390-91.

In determining the sufficiency of defendant’s allegations, we look to the support provided for them. In this instance, defendant has provided a copy of Szumigala’s medical records, as well as a copy of Russman’s opinion letter. These materials support defendant’s 
Brady 
allegations, the truth of which may not be determined at this stage of the proceedings.

We hold that defendant’s 
Brady 
allegations are sufficient to make a substantial showing of a constitutional violation and to require an evidentiary hearing to determine if the violation did in fact occur. The circuit court’s dismissal of these particular claims without an evidentiary hearing was improper. We express no opinion as to the actual merits of these claims. Rather, we reverse and remand with instructions for the circuit court to proceed to the evidentiary stage on defendant’s 
Brady 
claims. See 
Simms
, 192 Ill. 2d at 392. We note in passing that there appears to be some dispute as to whether the State was in possession of Szumigala’s medical records at the time when defense counsel requested discovery as to such records. This question, of course, will be determined in the evidentiary hearing.

C. 
Defense Counsel’s Alleged Failure to Investigate

In a related argument, defendant contends that his defense counsel was ineffective for failing to use Szumigala’s medical records to challenge Szumigala’s testimony at the second sentencing hearing. Defendant asserts that these records were readily available by subpoena, and he argues that if counsel had properly investigated, he would have obtained them and could have used them to attack Szumigala’s testimony. According to defendant, this “failure to investigate and present a readily available defense” was professionally unreasonable. He argues in addition that if this defense had been presented, there is a reasonable probability that he would not have been sentenced to death.

As noted, a claim of ineffective assistance of counsel is evaluated according to the two-prong test set forth in 
Strickland
, which requires a showing that counsel’s performance was deficient and that defendant suffered prejudice as a result. “Both prongs of the 
Strickland 
test must be satisfied before a defendant can prevail on a claim of ineffective assistance of counsel.” 
Coleman
, 183 Ill. 2d at 397.

In order to satisfy the first element of this test, a defendant must demonstrate that his counsel’s performance fell below an objective standard of reasonableness. 
Strickland
, 466 U.S. at 688, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. Regarding the application of this standard to an alleged failure to investigate, the Court in 
Strickland
 stated:

“These standards [for determining whether counsel’s performance was deficient] require no special amplification in order to define counsel’s duty to investigate ***. *** [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel’s judgments.” 
Strickland
, 466 U.S. at 690-91, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066.

Thus, any decision by counsel to conduct a less-than-complete investigation would fall within the wide range of professionally competent assistance, so long as the decision were supported by a reasonable professional judgment.

At defendant’s first sentencing hearing, which took place in 1984, Szumigala did not testify. The evidence presented with reference to Szumigala consisted of a certified copy of defendant’s conviction for the 1971 robbery of Szumigala; the testimony of Chicago police detective Bernard Stahl, who investigated the robbery and whose testimony comprised about six transcript pages; and a stipulation to the testimony of the physician who treated Szumigala in the hospital on the night of the robbery. The injuries described in this stipulation, which was read into the record by the prosecutor, correspond fairly closely to the injuries mentioned in Szumigala’s medical records. According to the stipulated testimony, Szumigala suffered contusions of the right eye, nose, upper lip and chest, as well as a laceration to the right upper eyelid. In addition, he had a possible cerebral concussion. X rays of Szumigala’s chest, jaw, shoulder, skull and other areas were negative with respect to fractures. According to the stipulation, “the injuries were confined to the tissues themselves.” The stipulation makes no mention of any dislocation of Szumigala’s shoulder or any other joint or of his eye being out of place.

Defendant acknowledges that “[a]t Mr. Harris’ first sentencing hearing, the State presented a relatively accurate account of Mr. Szumigala’s rather minor injuries.” However, defendant argues that because the State introduced such evidence at the 
first
 sentencing hearing, defense counsel “should have anticipated that Mr. Szumigala would be a witness or at least that the State would attempt to introduce evidence of his injuries” at the second sentencing hearing. According to defendant, counsel’s failure to follow up and obtain Szumigala’s medical records so that he could use them to challenge Szumigala’s testimony constituted deficient performance on counsel’s part.

As 
Strickland 
instructs, we evaluate the reasonableness of counsel’s challenged conduct “from counsel’s perspective at the time,” taking all of the circumstances into consideration. 
Strickland
, 466 U.S. at 689, 690, 80 L. Ed. 2d at 694, 695, 104 S. Ct. at 2065, 2066. Prior to the second sentencing hearing, defense counsel filed two motions for discovery pertaining to this matter. As defendant asserts in his amended post-conviction petition, one of these motions “specifically requested discovery regarding the testimony of aggravation witnesses,” and the other included a request for any reports of experts made in connection with the case, including the results of physical examinations. In response to counsel’s discovery requests, the State turned over a copy of Szumigala’s 1971 testimony in the robbery trial, and defense counsel used this testimony to cross-examine Szumigala in the second sentencing hearing. However, as indicated previously, the State did not disclose Szumigala’s medical records. Given that these records were not disclosed, and given the “rather minor” nature of the injuries described in the stipulation in the first sentencing hearing, it would be professionally reasonable for counsel to conclude that further investigation regarding Szumigala’s injuries was unnecessary and that counsel’s investigative energies would be more profitably directed elsewhere. As noted, counsel presented extensive mitigation evidence at the second sentencing hearing, including the testimony of seven witnesses. In addition, a report prepared by a mitigation specialist was admitted into evidence.

Applying “a heavy measure of deference to counsel’s judgments” (
Strickland
, 466 U.S. at 691, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066), and taking all of the circumstances into consideration (
Strickland
, 466 U.S. at 690, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066), we conclude that defendant has failed to establish that his counsel’s performance fell below an objective standard of reasonableness. The failure to obtain Szumigala’s medical records was not an error “so serious that counsel was not functioning as the ‘counsel’ guaranteed the defendant by the Sixth Amendment” (
Strickland
, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064). Because defendant has not shown that his counsel’s performance was deficient, he has failed to satisfy the first prong of the 
Strickland
 test. Therefore, his claim of ineffective assistance of counsel must fail. 
Morgan
, 187 Ill. 2d at 530. The trial court correctly dismissed this post-conviction claim without an evidentiary hearing.

D. 
Victim Impact Evidence

Finally, defendant contends that his appellate counsel was ineffective for failing to challenge on direct appeal the State’s use of victim impact evidence from an unrelated crime. The evidence in question is Szumigala’s testimony as to the injuries he suffered as a result of the 1971 robbery. According to defendant, in 1993 when his appeal in 
Harris II
 was filed, there was a strong possibility that such evidence was inadmissible, particularly as it related to long-term effects such as Szumigala’s alleged color-blindness. In defendant’s view, his appellate counsel should have recognized this possibility and included this issue in his brief on appeal.

As noted, a claim of ineffective assistance of appellate counsel is evaluated under the same two-prong standard set forth in 
Strickland
 for assessing claims of ineffective assistance of trial counsel. 
Haynes
, 192 Ill. 2d at 476; 
Richardson
, 189 Ill. 2d at 412. Where a defendant contends that appellate counsel was ineffective for failing to raise an issue, the defendant must show that this failure was objectively unreasonable and that the defendant suffered prejudice as a result. Both prongs of this test must be satisfied in order to prevail on an ineffective assistance claim. 
Morgan
, 187 Ill. 2d at 530. In order to satisfy the first prong, 
i.e.
, that counsel’s performance was deficient, the defendant must demonstrate that “counsel’s representation fell below an objective standard of reasonableness.” 
Strickland
, 466 U.S. at 688, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. Determinations as to whether this standard has been met are based on “the facts of the particular case, viewed as of the time of counsel’s conduct.” 
Strickland
, 466 U.S. at 690, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066. In addition, judicial scrutiny of counsel’s performance is “highly deferential.” 
Strickland
, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065. There is a strong presumption that counsel’s assistance was adequate and that counsel “made all significant decisions in the exercise of reasonable professional judgment.” 
Strickland
, 466 U.S. at 690, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066.

In the case at bar, the determination of whether appellate counsel’s performance was deficient turns to a large extent on the state of the relevant law in 1993 when the appeal in 
Harris II 
was filed. In 
Payne v. Tennessee
, 501 U.S. 808, 115 L. Ed. 2d 720, 111 S. Ct. 2597 (1991), the United States Supreme Court held that evidence about the victim of a murder and about the impact of the murder on the victim’s family is admissible during the penalty phase of a capital trial. 
Payne
, 501 U.S. at 827, 115 L. Ed. 2d at 736, 111 S. Ct. at 2609. The Court in 
Payne 
did not address the question of whether victim impact evidence from 
unrelated
 crimes was admissible. 
People v. Hope
, 184 Ill. 2d 39, 56-57 (1998) (Miller, J., concurring in part and dissenting in part).
(footnote: 3) The decision in 
Payne 
overruled 
Booth v. Maryland
, 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2527 (1987), and 
South Carolina v. Gathers
, 490 U.S. 805, 104 L. Ed. 2d 876, 109 S. Ct. 2207 (1989), which had held that victim impact evidence was inadmissible in a capital sentencing proceeding.

A few months after the Supreme Court’s decision in 
Payne
, this court decided 
People v. Howard
, 147 Ill. 2d 103 (1991), which adopted the holding in 
Payne
. In 
Howard
, similar to the case at bar, the defendant complained about the State’s use of victim impact evidence at his capital sentencing hearing. This evidence consisted of testimony from the victims of 
other 
offenses committed by the defendant. While the court in 
Howard 
“left unanswered” the question of the admissibility of victim impact evidence from other crimes (
Hope
, 184 Ill. 2d at 49), it nevertheless found “no error” in the presentation of this evidence in the case before it (
Howard
, 147 Ill. 2d at 158). The court in 
Howard 
affirmed the defendant’s death sentence.

Given the decisions in 
Payne 
and 
Howard
, a reasonably competent attorney in 1993 might very well have decided not to raise on direct appeal the issue of whether other-crimes evidence was admissible. Based on 
Payne 
and 
Howard
, there did not appear to be a strong possibility that such evidence would be held inadmissible. “ ‘Appellate counsel is not obligated to brief every conceivable issue on appeal, and it is not incompetence of counsel to refrain from raising issues which, in his or her judgment, are without merit, unless counsel’s appraisal of the merits is patently wrong.’ ” 
Haynes
, 192 Ill. 2d at 476, quoting 
Easley
, 192 Ill. 2d at 329.

Notwithstanding the foregoing, defendant points to two 1992 decisions by this court in which, according to defendant, we “gave indications that victim impact evidence from a prior unrelated offense might well be inadmissable [
sic
].” We disagree. Neither 
People v. Johnson
, 149 Ill. 2d 118 (1992), nor 
People v. Mitchell
, 152 Ill. 2d 274 (1992), considered the admissibility of victim impact evidence from other crimes. In 
Mitchell
 the defendant challenged the admission during sentencing of life photographs of the two murder victims. The court in 
Mitchell
 found that this issue had been waived and concluded that the admission of the photographs was not plain error. In explaining this decision, the court noted that “the Supreme Court in 
Payne 
recently held that victim impact evidence is admissible during sentencing proceedings in capital cases.” 
Mitchell
, 152 Ill. 2d at 338. In 
Mitchell
, as in 
Payne
, the challenged evidence dealt with victims of the crime in question, not with victims of 
other
 crimes committed by the defendant. The court in 
Mitchell
 also stated:

“We caution, however, that 
Payne 
does not give the prosecution free rein to introduce and argue anything it wants. As the 
Payne
 court warned: ‘In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief.’ ” 
Mitchell
, 152 Ill. 2d at 338, quoting 
Payne
, 501 U.S. at 825, 115 L. Ed. 2d at 735, 111 S. Ct. at 2608.

Given the specific evidence upon which the court in 
Mitchell
 was ruling, 
i.e.
, life photographs of the victims of the crime in question, we do not believe this language could be taken to indicate, as defendant contends, “that victim impact evidence from a prior unrelated offense might well be inadmissable [
sic
]”. The key to the import of this language is the sentence that is quoted from 
Payne
. In 
Payne
, the purpose of this sentence was to help explain that not all victim impact evidence from the crime in question is 
per se
 admissible. The Court’s precise holding as to this issue was that “the Eighth Amendment erects no 
per se 
bar” to such evidence. 
Payne
, 501 U.S. at 827, 115 L. Ed. 2d at 736, 111 S. Ct. at 2609. The Court explained:

“We think the 
Booth 
Court was wrong in stating that this kind of evidence leads to the arbitrary imposition of the death penalty. In the majority of cases, and in this case, victim impact evidence serves entirely legitimate purposes. 
In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief
.” (Emphasis added.) 
Payne
, 501 U.S. at 825, 115 L. Ed. 2d at 7 35, 111 S. Ct. at 2608.

The quoting of this italicized sentence in the passage from 
Mitchell
 indicates that the court in 
Mitchell
 was simply stating what the court in 
Payne 
had stated: not all victim impact evidence from the crime in question is automatically admissible during sentencing. There is nothing in the passage quoted from 
Mitchell
 to indicate that the court was referring to victim impact evidence from 
other 
crimes.

In 
Johnson
, the defendant challenged the State’s use at his sentencing hearing of testimony from the father of the murder victim. In this testimony, the father “explained the effect of the victim’s death upon him and other family members.” 
Johnson
, 149 Ill. 2d at 152. The court in 
Johnson 
rejected the defendant’s argument, noting that the Supreme Court in 
Payne
 had held that such evidence was admissible. The court also cited this court’s decision in 
Howard
 and concluded that “[t]o the extent 
Payne 
and 
Howard 
permit the introduction of victim impact evidence, we concur.” 
Johnson
, 149 Ill. 2d at 153.

Here again, as in 
Mitchell
, the challenged evidence concerns the victims of the crime in question, not the victims of other crimes committed by the defendant. Similar to 
Mitchell
, the decision in 
Johnson 
cannot be taken to indicate “that victim impact evidence from a prior unrelated offense might well be inadmissable [
sic
].” Indeed, because it mentions 
Howard
, the decision in 
Johnson 
might be seen as supporting the admissibility of such evidence.

There is nothing in 
Johnson 
or 
Mitchell
 that persuades us to alter our view as to the state of the law on other-crimes evidence at the time when defendant’s appeal in 
Harris II
 was filed. Based on the legal landscape in 1993 regarding this issue, a reasonably competent attorney might very well have declined to raise this question on direct appeal.

Defendant also points to an affidavit of Charles Hoffman, his appellate counsel in his appeal in 
Harris II
. In this affidavit, which was attached to defendant’s amended post-conviction petition, Hoffman states that his failure to raise on direct appeal the admissibility of Szumigala’s victim impact testimony was not a “strategic decision.” Rather, Hoffman indicates that he failed to read the 
Howard
 decision carefully enough to realize that the issue of the admissibility of such other-crimes evidence had been left unanswered in 
Howard
. Accordingly, at the time he prepared defendant’s brief on appeal in 
Harris II
, Hoffman “assumed that Mr. Szumigala’s testimony about the impact of the crime committed upon him was admissible under the reasoning of 
Payne
 and 
Howard
.”

Defendant appears to argue that this affidavit demonstrates that appellate counsel’s performance was deficient. However, as we held in 
People v. Sanchez
, 169 Ill. 2d 472, 490 (1996), “[c]ounsel’s own admission of ineffectiveness is not binding on us or determinative of the issues raised here.” As 
Strickland
 instructs, counsel’s performance is assessed against an “objective standard of reasonableness.” 
Strickland
, 466 U.S. at 688, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064, cited in 
Sanchez
, 169 Ill. 2d at 490. In evaluating defendant’s claim of ineffective assistance of appellate counsel, the appropriate question is not whether defendant’s counsel himself viewed his performance as deficient, but rather whether a reasonably competent attorney, in the same circumstances, would have decided not to raise the admissibility of other-crimes evidence on direct appeal. As we have indicated, we believe that a reasonably competent attorney in 1993 might well have made such a decision. Viewing appellate counsel’s performance “as of the time of counsel’s conduct” (
Strickland
, 466 U.S. at 690, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066), and taking into consideration all of the relevant circumstances, we conclude that counsel’s performance fell within the “wide range of professionally competent assistance” (
Strickland
, 466 U.S. at 690, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066) and therefore was not deficient. Because defendant has failed to satisfy the performance prong of the 
Strickland 
test, his claim of ineffective assistance of appellate counsel is without merit. 
Morgan
, 187 Ill. 2d at 530. Therefore, the trial court correctly dismissed this post-conviction claim without an evidentiary hearing.

CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Cook County dismissing defendant’s amended post-conviction petition without an evidentiary hearing is affirmed in part and reversed in part. The circuit court is instructed to hold an evidentiary hearing with respect to defendant’s 
Brady
 claims. As to the dismissal of the remaining claims, the circuit court’s order is affirmed.

Circuit court judgment affirmed in part

 and reversed in part
;

cause remanded
.

JUSTICE KILBRIDE, concurring in part and dissenting in part:

The majority correctly reverses in part the judgment of the circuit court and remands this cause for an evidentiary hearing on defendant’s 
Brady
 claims. Nevertheless, for the reasons set forth in my dissents in 
People v. Hickey
, No. 87286, slip op. at 39-43 (September 27, 2001) (Kilbride, J., dissenting), and 
People v. Simpson
, Nos. 85084, 86926, slip op. at 35-38 (September 27, 2001) (Kilbride, J., dissenting), I believe that the majority fails to grant defendant the constitutionally required relief of a new trial conducted in accordance with the new supreme court rules governing capital cases. The procedures in capital cases prior to this court’s adoption of the new rules were inherently unreliable and did not adequately protect a defendant’s constitutional rights. Consequently, since the new rules were promulgated to address the deficiencies of constitutional dimension that regularly occurred under the old system, the rules must be applied retroactively to all capital cases. See 
People v. Caballero
, 179 Ill. 2d 205, 220-21 (1997).

FOOTNOTES
1:     
1
Najdowski had a close friend who was a corporate attorney; Gray’s father was a corporate attorney; and Dolan had a cousin who was an attorney. 

2:     
2
Szumigala’s testimony consumed some 30 transcript pages. 

3:     
3
In 
People v. Hope
, 184 Ill. 2d 39 (1998), this court explicitly held that the unforeseen effects of a defendant’s prior crimes upon the victims of those crimes are too attenuated to be relevant to the defendant’s sentencing for the murder in question. 
Hope
, 184 Ill. 2d at 52-53. Accordingly, such other-crimes victim-impact evidence is inadmissible at sentencing. We note that this decision was issued in 1998, five years after the filing of the appeal in 
Harris II
, and therefore has no relevance to an assessment of counsel’s performance in 1993.