2019 IL App (1st) 170252-U

FIFTH DIVISION
Order filed: November 8, 2019

No. 1-17-0252

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 05 CR 21453 |
| | ) | |
| JAMES MEDLEY, | ) | Honorable |
| | ) | Thaddeus L. Wilson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE HOFFMAN delivered the judgment of the court.
Justices Rochford and Delort concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the first-stage summary dismissal of the defendant's postconviction petition because the defendant failed to make an arguable claim that his trial counsel was ineffective.

¶ 2    The defendant appeals from the summary dismissal of his petition pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2016)). The defendant's postconviction petition alleged, in relevant part, that trial counsel, at the defendant's second murder trial, was

ineffective for advising the defendant to proceed to a stipulated bench trial, and that trial counsel was also ineffective for failing to present the testimony of Dr. Macasaet[1], the emergency room physician who treated the victim. The circuit court dismissed the defendant's petition as frivolous and patently without merit. We affirm.

¶ 3    Following a jury trial, the defendant, James Medley, Jr., was convicted of first degree murder (720 ILCS 5/9-1(a)(2) (West 2004)) in connection with the death of his girlfriend, Ethel Adams. The trial court granted the defendant's motion for a new trial based on a failure to instruct the jury on involuntary manslaughter. The parties agreed to proceed to a bench trial where they stipulated to all of the evidence at the original trial. The testimony from an additional occurrence witness was also presented. The trial court found the defendant guilty of first degree murder and sentenced him to 39 years' imprisonment. On appeal, the defendant argued that his trial attorneys were ineffective for failing to investigate an expert witness, Dr. Shaku Teas, and call her to testify at trial. We affirmed. *People v. Medley*, 2015 IL App (1st) 112814-U. The defendant subsequently filed the postconviction petition, which the circuit court summarily dismissed. This appeal follows.

¶ 4    The facts of this case are adequately set forth in our order disposing of the defendant's direct appeal. We summarize them here only to the extent necessary for an understanding of the issues in this appeal.

¶ 5    At the defendant's initial jury trial, the State presented evidence that the defendant was driving a car with Adams as a passenger. Witnesses described seeing the defendant "bang" Adams's head into the dashboard. As the car stopped, the defendant was seen pulling Adams,

---

[1] Dr. Macasaet's first name does not appear in the record.

who was partially out of the passenger door, back into the car by the collar of her shirt. The defendant got out of the car as a crowd gathered. People were yelling that Adams was not breathing, but the defendant said that "she [*sic*] just drunk and trying to get some attention." The defendant attempted to leave as ambulance personnel arrived, but was confronted by several men in the crowd and knocked unconscious.

¶ 6    Dr. Claire Cunliffe, an assistant medical examiner for Cook County, testified for the State as an expert in the field of forensic pathology. Dr. Cunliffe performed external and internal examinations on Adams's body as well as a toxicology screening. She also relied on a case report prepared by an investigator regarding the circumstances surrounding Adams's death. Dr. Cunliffe testified that Adams was 5' 7" tall and weighed 209 pounds. In addition to various abrasions and bruises on Adams's head, nose, shoulders, left arm, right wrist, and right knee, Dr. Cunliffe also observed "faint" bruising around the front, left, and right sides of Adams's neck. Dr. Cunliffe's internal examination revealed hemorrhaging in Adams's neck muscles and deep subcutaneous tissue, as well as petechial and sclera hemorrhaging in her right eye. Dr. Cunliffe also found multiple petechial and subgaleal hemorrhages in Adams's scalp which is consistent with Adams's head having contact with a flat foreign object. Dr. Cunliffe further noted that Adams had an enlarged heart, weighing about 563 grams, and her left anterior descending artery and right coronary artery showed 90 percent narrowing. Adams also had metal stints in place and the myocardial muscle in her heart was thickened. Dr. Cunliffe testified that she did not see any evidence that Adams died of a heart attack or as a result of heart disease. Finally, the toxicology report revealed that Adams's blood-alcohol level was 0.14, over one and-a-half times the legal

limit for operation of a motor vehicle. Dr. Cunliffe opined that the cause of Adams's death was homicide by strangulation.

¶ 7    On cross-examination, Dr. Cunliffe explained the difference between manual strangulation and ligature strangulation. Manual strangulation involves the use of hands, while "ligature" strangulation occurs when a person is strangled with clothing or some other article. Dr. Cunliffe testified she could not determine whether Adams was manually strangled or strangled with some sort of ligature. Dr. Cunliffe stated that she was given a v-neck shirt that Adams was wearing and that the injuries to Adams's neck are consistent with someone pulling the back of a v-neck shirt. She said that there are anecdotal reports of people dying from strangulation in a matter of seconds, but there are no studies to pinpoint how long it takes to strangle someone to death. Dr. Cunliffe testified that, if someone pulled hard enough on Adams's v-neck shirt, it could cause strangulation. Dr. Cunliffe further testified that Adams's neck cartilage and hyoid bone were intact, but explained that an intact hyoid bone does not necessarily mean Adams did not die of strangulation because the hyoid bone can remain flexible and certain methods of strangulation do not result in a broken hyoid bone. Dr. Cunliffe did not find any evidence that Adams had been held by her hair or that her hair had been pulled back and forth.

¶ 8    The defendant moved for a directed verdict, and the trial court denied the motion.

¶ 9    The defendant testified that he and Adams were in a dating relationship. On the day she died, they were drinking wine and driving in his car. Both were intoxicated. The defendant testified that he and Adams argued about ten dollars that she was "holding for us." The money "came up missing," and Adams did not know what happened to it. As they argued, Adams became hysterical and said she was going to jump from the car, which was travelling at 15 to 20

miles per hour. When Adams opened the door and tried to jump, the defendant grabbed her by her shirt collar. The defendant stopped the car, and Adams broke his grip and stepped out of the car. She stepped out of the car, fell back on her knee, and slumped over the seat. The defendant testified he could not remember grabbing Adams by her hair. He denied "bashing" her face into the dashboard, placing his hands around her neck, or strangling her.

¶ 10    Following closing arguments, the jury found the defendant guilty of first degree murder.

¶ 11    The defendant, through new counsel, filed a post-trial motion asserting that the trial court erred in failing to tender an involuntary manslaughter jury instruction. The trial court granted the defendant's post-trial motion, vacated the defendant's conviction for first degree murder, and ordered a new trial.

¶ 12    The defendant's second trial commenced on March 9, 2009. The defendant waived his right to a jury trial, and the parties stipulated to the testimony presented at the first trial, including the defendant's own testimony. The State also presented the testimony of Antoinette Brown.

¶ 13    Brown testified to a similar sequence of events as the occurrence witnesses from the defendant's first trial. However, she added that, after the vehicle came to a stop, she observed the defendant choking the passenger by placing both of his hands around her neck for two to five minutes. After Brown testified, the parties stipulated that Brown had called 911 and reported that a man was choking and severely beating a woman.

¶ 14    In closing argument, the State argued that it proved the defendant guilty of first degree murder beyond a reasonable doubt because the evidence established that he used his hands to "[choke] the last breath out of [Adams] until she died." The defense argued that the evidence

showed that Adams's death was an accident and urged the trial court to find the defendant not guilty. Alternatively, defense counsel asserted the defendant's attempt to pull Adams into the vehicle was reckless conduct warranting a finding of involuntary manslaughter.

¶ 15    After hearing arguments, the trial court found the defendant guilty of first degree murder.

¶ 16    The defendant hired a new attorney to handle his posttrial proceedings. Posttrial counsel filed a motion for a new trial alleging, *inter alia*, that the defendant was deprived of effective assistance of counsel at his second trial where his attorneys failed to properly investigate and present expert testimony that Adams was not strangled to death but, rather, died of heart disease precipitated by the stress of the altercation.

¶ 17    The circuit court held an evidentiary hearing on the defendant's claim of ineffective assistance of counsel. At that hearing, the defendant called Dr. Shaku Teas, a forensic pathologist. Dr. Teas testified that she reviewed Adams's medical records, the autopsy report, photos, histology slides, police and EMS reports, as well as Dr. Cunliffe's testimony. Dr. Teas stated that she did not find enough evidence of strangulation and opined that Adams died from "coronary atherosclerosis combined with hypertensive cardiovascular disease precipitated by the stress of the altercation." Dr. Teas further testified that she shared her findings with Steven Greenberg, the defendant's attorney from the first trial. Dr. Teas had several phone conversations with Greenberg in which she said she would testify that Adams's heart disease played a significant role in her death and that evidence of strangulation was lacking. However, Greenberg indicated that he could get that information out of the State's medical examiner, and he did not need Dr. Teas to testify at trial. Dr. Teas also testified that she spoke with Scott Frankel, one of

the defendant's attorneys from the second trial, and she reiterated her opinion that Adams died of heart disease under the stress of the altercation.

¶ 18    Frankel testified that he learned about Dr. Teas through conversations he had with Greenberg. Frankel then spoke with Dr. Teas on the phone, and Dr. Teas said that Adams suffered from heart disease which contributed to her death. After speaking with Dr. Teas, Frankel reviewed the trial transcripts, including Greenberg's cross-examination of Dr. Cunliffe, and discussed Dr. Teas's proposed testimony with co-counsel, Stanley Hill. Frankel and Hill both agreed that Dr. Teas proposed testimony would not help the defense's case.

¶ 19    Hill testified that he never spoke with Dr. Teas because he was aware that Frankel spoke with Dr. Teas and Greenberg regarding Dr. Teas's proposed testimony. Hill stated that, based on his conversations with Frankel, Dr. Teas's proposed testimony would not add anything to the defense's case. Hill explained that the defense's theory was that the defendant's conduct— attempting to pull Adams into the vehicle by grabbing the back of her shirt—was accidental at best, reckless at worst. Hill believed that Dr. Cunliffe's testimony supported this theory of the case because she testified that strangulation could occur in a matter of seconds and that Adams may have died from a ligature strangulation—*i.e.*, her v-neck shirt being pulled around her neck. Hill stated, "we agreed to take a stipulated bench trial because we wanted the evidence to come in the same way that it had come in the first trial." Hill also noted that Dr. Teas's testimony would not help the defendant because "[y]ou take your victim like you found them," and, regardless of whether the defendant strangled Adams or caused her to suffer a heart attack, the outcome would be the same because his unlawful conduct caused Adams's death.

¶ 20    After hearing the evidence, the trial court found the defendant was not denied effective assistance of counsel at his second trial and denied his motion for a new trial. The court sentenced the defendant to 39 years' imprisonment. The defendant appealed.

¶ 21    On appeal, the defendant argued that he was denied his right to the effective assistance of counsel where his trial attorneys failed to investigate and call Dr. Teas as an expert witness to rebut the State's evidence that Adams died from strangulation, not heart disease. We held that counsels' actions did not fall below prevailing professional norms and that their investigation of Dr. Teas was " 'well within the range of professionally reasonable judgments.' " *Medley*, 2015 IL App (1st) 112814-U, ¶ 29 (quoting *Strickland v. Washington*, 466 U.S. 668, 699 (1984)). We further held that the defendant could not establish prejudice noting, in part: "Nor do we find any reasonable probability that the trier of fact would have credited the defendant's argument that Adams heart disease showed that his conduct was reckless as opposed to intentional." *Id*. ¶ 30.

¶ 22    In October, 2016, the defendant, with the assistance of counsel, filed a petition for postconviction relief pursuant to the Post-Conviction Hearing Act (725 ILCS 122-1 *et seq.* (West 2016)). The petition contended, as relevant here, trial counsel was ineffective for advising the defendant to proceed to a stipulated bench trial, and the defendant was denied the effective assistance of counsel when trial and post-trial counsels failed to present the testimony of Dr. Macasaet, which would have supported the argument that Adams died as the result of heart disease. The petition did not include an affidavit of Dr. Macasaet detailing his proposed testimony. In the petition, the defendant acknowledged that appellate counsel raised "this issue" on appeal, but argued that the issue was not barred by *res judicata* because a police report and

medical reports by Dr. Macasaet were attached to the petition and constituted newly discovered evidence because they were not present in the trial record.

¶ 23    The circuit court, in a written order, held that the defendant's claims were frivolous and patently without merit because, *inter alia*, they were barred by *res judicata* and because the defendant could not establish prejudice where the proposed testimony was unlikely to change the outcome of the trial. This appeal follows.

¶ 24    The Act provides an avenue by which a criminal defendant may challenge his conviction or sentence for violations of his federal or state constitutional rights. *People v. Whitfield*, 217 Ill. 2d 177, 183 (2005). The scope of postconviction proceedings is limited to constitutional matters that have not been, and could not have been, previously adjudicated. *Id.* A postconviction proceeding has three stages. *People v. Tate*, 2012 IL 112214, ¶ 9. During the first stage, as in the case before us, the circuit court acts in an administrative capacity and screens out those petitions which lack legal substance of are obviously without merit. See *Id.* "The court makes an independent assessment as to whether the allegations in the petition, liberally construed and taken as true, set forth a constitutional claim for relief." *People v. Hommerson*, 2014 IL 115638, ¶ 7 (citing, *People v. Boclair*, 202 Ill. 2d 89, 99 (2002)). We review *de novo* the first-stage dismissal of a postconviction petition. *Id.* ¶ 6.

¶ 25    The defendant's claims are based on ineffective assistance of trial and appellate counsel. The assistance of both trial and appellate counsel is judged against the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Harris*, 206 Ill. 2d 1, 34 (2002). To establish ineffective assistance under *Strickland*, a defendant must show that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable

probability that but for counsel's unprofessional errors the result of the proceeding would have been different. *People v. Manning*, 241 Ill. 2d 319, 326 (2011) (citing *Strickland*, 466 U.S. at 688, 694). In a first-stage postconviction setting, a defendant need only set forth the "gist" of a claim and the petition survives summary dismissal if: "(i) it is arguable that counsel's performance fell below an objective standard of reasonableness and (ii) it is arguable that the defendant was prejudiced." *People v. Hodges*, 234 Ill. 2d 1, 17 (2009).

¶ 26 The defendant first contends that he was denied the effective assistance of trial counsel because trial counsel advised him to proceed with a "stipulated" bench trial and appellate counsel was ineffective for failing to raise the issue on direct appeal. We find that we need not determine whether the decision to advise the defendant to proceed by way of a bench trial constituted deficient performance. The defendant was obligated to allege arguable prejudice as a result of the allegedly deficient performance, and his petition does not do so. The defendant's petition alleges only that the outcome of the trial would have been different if he had elected a jury trial and presented additional evidence. The petition states, in relevant part:

> "By proceeding in front of Judge Salone, [the defendant's] attorney essentially waived their primary defense of involuntary manslaughter. Had they proceeding [*sic*] in front of a jury and called Dr. Teas and the treating ER doctor, on the other hand, Medley had a viable defense. Notably, the jury at the first trial struggled to reach a verdict and specifically sent a note asking about a lesser included offense. [Citation] Given that Dr. Teas and Dr. Macasaet both would have testified Adams died from heart problems, it is questionable if [the defendant's] testimony would have been necessary."

This allegation identifies nothing, in the decision to proceed by way of a bench trial, which, by itself, resulted in prejudice, and instead conflates the issue with the failure to call additional witnesses (which we address *infra*).

¶ 27    In his opening brief, the defendant simply concludes that if he had not proceeded by way of a bench trial, "the outcome of the second trial would have been different." As the State notes, the defendant "does not explain in any way why the outcome of the trial would have been different." In his reply brief, the defendant adds that if he had not opted for a bench trial, "Judge Salone would have given the manslaughter instruction and there is reasonable likelihood that [the defendant] would have been convicted of manslaughter instead of murder." We simply note that Judge Salone was equally capable of finding defendant guilty of the lesser included offense of manslaughter. The defendant has identified no error in Judge Salone's reasoning or deficiency in the evidence submitted at the bench trial. The defendant is apparently relying solely on the hope that a jury, as the trier of fact, would have been more lenient than the judge who decided the case. However, it is well established that a defendant has no entitlement to rely on the luck of a lawless decision maker. See *Strickland*, 466 U.S. at 694-95 ("An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like. A defendant has no entitlement to the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed.")

¶ 28    Here, the defendant has not alleged any prejudice as a result of the allegedly deficient decision to proceed by way of a bench trial. We conclude that the petition failed to make an arguable claim of prejudice, and the circuit court did not err when it found this claim to be frivolous and patently without merit.

¶ 29    The defendant also contends that trial counsel was ineffective for failing to call Dr. Teas and Dr. Macasaet to testify that Adams died of a heart attack and not strangulation. Although the defendant attempts to conflate his arguments regarding these two separate witnesses, we find that our analysis requires considering each witness separately.

¶ 30    First, with respect to the testimony of Dr. Teas, this contention is clearly barred by *res judicata*. "The doctrine of *res judicata* bars consideration of issues that were previously raised and decided on direct appeal." *People v. Blair*, 215 Ill. 2d 427, 443 (2005). Here, the defendant raised the issue of Dr. Teas's testimony in his posttrial motion. The issue was fully developed, including an evidentiary hearing, and rejected by the circuit court. The defendant raised the issue on appeal, and we decided it on its merits, noting, in part, "the defendant cannot overcome the strong presumption that counsels' decision not to call Teas as a witness was objectively reasonable." *Medley*, 2015 IL App (1st) 112814-U, ¶ 26. We further noted, "Moreover, Teas testimony would have likely had no effect on the outcome of trial." This issue was raised on direct appeal and decided, on its merits, against the defendant. *Res judicata* prevents him from raising it again.

¶ 31    The issue of Dr. Macasaet's testimony was not raised on direct appeal, but we need not address it on its merits because the defendant's petition fails to adequately plead the failure to present a witness because the defendant did not attach an affidavit from Dr. Macasaet detailing his proposed testimony. Section 122-2 of the Act requires that a defendant support his allegations with "affidavits, records, or other evidence." 735 ILCS 5/122-2 (West 2016). We acknowledge that our supreme court has recently held that an affidavit from a proposed witness is not always required to support a postconviction petition. See *People v. Dupree*, 2018 IL 122307, ¶ 34 ("[T]o

interpret our case law as requiring an affidavit in all instances where this type of claim is raised is simply incorrect."). However, in this case, an affidavit was required, because the other evidence the defendant attached to his petition sheds no light on whether Dr. Macasaet would have provided testimony helpful to the defendant.

¶ 32    The defendant notes that a police report stated that Dr. Macasaet stated that Adams was in "full cardiac arrest upon arrival" at the hospital. The defendant further notes that Adams was given "bicarb" and "atropine" and argues that these are drugs used to treat individuals suffering from heart attacks. The defendant fails to recognize that none of this evidence supports his conclusion that Dr. Macasaet's testimony would have supported Dr. Teas's opinion regarding what *caused* Adams's heart to stop. It is undisputed that Adams's heart stopped beating and that the paramedics and Dr. Macasaet unsuccessfully attempted to revive her. However, without an affidavit from Dr. Macasaet, we cannot determine whether he would have agreed with Dr. Teas's opinion that Adams died as the result of heart disease rather than strangulation. Therefore, we find that this evidence, by itself, is inadequate to support a claim that trial counsel was ineffective for failing to call Dr. Macasaet as a witness. Accordingly, we conclude that circuit court did not err when it dismissed the defendant's petition as frivolous and patently without merit.

¶ 33    For the foregoing reasons the judgment of the circuit court of Cook County is affirmed.

¶ 34    Affirmed.